IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| ALEX HORMOZI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| NEIST MEDIA LLC, ALEX NEIST, | ) | JURY TRIAL DEMANDED |
| AND BENJAMIN READ, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>VERIFIED COMPLAINT</u>

Plaintiff Alex Hormozi, by counsel, hereby brings this lawsuit against Defendants Neist Media, LLC dba Hostage Tape ("Hostage Tape"), Alex Neist ("Neist"), and Benjamin Read ("Read") for the unlawful use of Mr. Hormozi's likeness to market its products. These products include nose strips, mouth tape, and other sleep and breathing aid products that prominently display Mr. Hormozi's likeness on its product packaging. Defendants also use Mr. Hormozi's likeness as its "avatar" or profile badge on various social media accounts, and sell collateral goods, such as t-shirts, that prominently feature Mr. Hormozi's likeness. With the knowledge that Mr. Hormozi has a strong association with nose strips and related sleep aids or breathing products, Defendants are intentionally free riding off the goodwill inherent in Mr. Hormozi's name, likeness, and brand identity. Despite Mr. Hormozi's repeated requests for the Defendants to stop the unlawful use of his likeness, Defendants have refused, disingenuously insisting that none of their uses look like, or are intended to look like, Mr. Hormozi. The evidence and a simple comparison of Mr. Hormozi's likeness and the likeness used by Defendants plainly

demonstrate the confusing similarity of the two likenesses, and such similarity has led to actual confusion in the marketplace. Therefore, Mr. Hormozi is forced to bring this lawsuit to vindicate his rights and seek damages under the Lanham Act and the common law of Minnesota. Accordingly, Mr. Hormozi states as follows:

## I. PARTIES, JURISDICTION, AND VENUE

1. Plaintiff, Mr. Hormozi, is an individual permanently residing in Las Vegas, Nevada.

2. Defendant, Hostage Tape, is a limited liability company organized in Minnesota, and with its principal place of business at 19320 Waterford Place, Excelsior, Minnesota 55331.

3. Hostage Tape has a registered office address at 6956 Huckleberry Dr., Minnetrista, Minnesota 55331.

4. On information and belief, Neist is an individual permanently residing at 19320 Waterford Place, Excelsior, Minnesota 55331 and is a member of Hostage Tape.

5. Neist is also the Manager of Hostage Tape.

6. On information and belief, Read is an individual permanently residing in Portland, Oregon and is also a member of Hostage Tape. On information and belief, he presently resides at 5232 NE 9th Ave Unit A, Portland, Oregon 97211-4380.

7. Both Neist and Read were personally involved in the design, creation, and distribution of the offending items described in this Verified Complaint.

8. Mr. Hormozi seeks damages from the Defendants for false endorsement in violation of the federal Lanham Act and violation of his right of publicity recognized under the common law of Minnesota.

9. This Court has subject matter jurisdiction over the false endorsement claim under 28 U.S.C. § 1331, since it presents a federal question under the Lanham Act, namely, a violation of 15 U.S.C. § 1125(a).

10. This Court has subject matter jurisdiction over the right of publicity claim under 28 U.S.C. § 1332, as Mr. Hormozi is domiciled in Nevada, Neist is domiciled in Minnesota, Read is domiciled in Oregon, and the amount in controversy exceeds $75,000 exclusive of costs and interest, giving this Court diversity jurisdiction.

11. In the alternative, this Court has supplemental jurisdiction over the right of publicity claim under 28 U.S.C. § 1367, since the right is so related to the federal question presented by the Lanham Act false endorsement claim that it forms part of the same case or controversy under Article III of the United States Constitution.

12. This Court has personal jurisdiction over Neist because he is domiciled in Minnesota, and it has personal jurisdiction over the remaining Defendants because they each engaged in substantial acts in or targeted at Minnesota since Hostage Tape has its principal place of business in Minnesota. Therefore, any of the unlawful acts described in this Verified Complaint were targeted at or completed in Minnesota.

13. Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) with respect to Neist and Hostage Tape, and it is proper with respect to all Defendants under 28 U.S.C.

§ 1391(b)(2), because Hostage Tape has its principal place of business in

Minnesota and the Defendants all carried out the acts complained of on behalf of

Hostage Tape. Therefore, a substantial part of the events or omissions giving

rising to the claim occurred in Minnesota.

## II. FACTS

**A.    Alex Hormozi's Background as a Well-Known Entrepreneur and Nose Strip User.**

14. Mr. Hormozi is a well-known Iranian American entrepreneur, investor,

philanthropist, best-selling author, online influencer, and social media personality.

He graduated *magna cum laude* with a Bachelor of Science from Vanderbilt

University. He has started and sold several of his own businesses, while also

substantially improving the revenue and profitability of over thirty-two other

businesses.

15. Two of his business books are currently Amazon #1 bestsellers.

16. His book, *$100M Leads*, is the current Amazon number one best seller in

"Advertising." Attached as Exhibit P1 is a true and accurate depiction of the

Amazon listing for this book.

17. Another one of Mr. Hormozi's books, *$100M Offers*, is a #1 bestseller on Amazon

in the category of "Business Sales," having sold over a half million copies of this

title and maintained its #1 ranking for two years. Attached as Exhibit P2 is a true

and accurate depiction of the Amazon listing for this book.

18. Mr. Hormozi has a significant online presence, including social media accounts and other online media accounts with significant followings.

19. Mr. Hormozi's social media accounts have millions of followers and his total online presence averages approximately 150 million views per month.

20. Approximately 2.7 million people follow Mr. Hormozi's Instagram account as of the date of this Verified Complaint. Attached as Exhibit P3 is a true and accurate depiction of Mr. Hormozi's Instagram account showing his follower count.

21. Over 2.5 million people subscribe to Mr. Hormozi's YouTube channel as of the date of this Verified Complaint. Attached as Exhibit P4 is a true and accurate depiction of Mr. Hormozi's YouTube account showing his follower count.

22. Mr. Hormozi operates a separate YouTube channel called "Mozi Media" with his wife, Leila Hormozi, which has over 97,000 followers as of the date of this Verified Complaint. Attached as Exhibit P5 is a true and accurate depiction of this YouTube account showing its follower count.

23. Mr. Hormozi has two public business Facebook accounts, with one account having about 83,000 followers and the other having about 109,000 followers as of the date of this Verified Complaint. Attached as Exhibits P6 and P7 are true and accurate depictions of these business Facebook pages.

24. Mr. Hormozi's Tik-Tok account has amassed over 900,000 followers and 19,000,000 likes as of the date of this Verified Complaint. Attached as Exhibit P8 is a true and accurate depiction of this account.

25. Over 658,000 people follow Mr. Hormozi's X (formerly Twitter) account as of the date of this Verified Complaint. Attached as Exhibit P9 is a true and accurate depiction of this account.

26. Mr. Hormozi's business LinkedIn account has over 429,000 followers as of the date of this Verified Complaint.

27. Mr. Hormozi's Threads account has over 459,000 followers as of the date of this Verified Complaint.

28. Mr. Hormozi has spent years intentionally cultivating this massive online presence and his personal brand to have impactful discussions about business, sales/marketing, fitness, and life, among other subjects interesting to Mr. Hormozi, which hopefully motivate similarly minded people to work hard, never quit, and win. This online platform provides the perfect launching point for Mr. Hormozi's businesses, products, services, and partnerships.

29. Mr. Hormozi is particularly well-known and credible in the "lifehack" space, that is, consumers interested in methods to save time or improve the efficiency of their business and their lives, because Mr. Hormozi started and managed many gyms, wrote "Gym Launch Secrets" and then founded "Gym Launch," a business "to help gym owners around the world reach more people, transform more lives, and build the business of their dreams."

30. There are a plethora of "fan" accounts, website posts, and other website content created by third parties commenting on Mr. Hormozi and his advice. Attached as Exhibit P10 are exemplary content of this kind.

31. A typical consumer of Mr. Hormozi's content is a male aged 25-35 years old and is usually interested in the aforementioned subjects upon which Mr. Hormozi speaks.

32. As a life-hacker, Mr. Hormozi often wears a nose strip in public talks, online posts, and online videos, and this fact is well-known among his target consumers. Attached as Exhibit P11 are true and accurate copies of various exemplary images, posts, and screen captures showing Mr. Hormozi's repeated use of nose strips in public, during public talks, or as part of his online videos and social media.

33. On YouTube and his social media platforms, Mr. Hormozi has several videos and posts that explain why nose strips are beneficial and how the use of nose strips has positively affected his life, including a YouTube video with over 2 million views. Attached as Exhibit P12 is a true and accurate screen capture of this YouTube video, entitled "Why I Wear Nose Strips," which depicts the thumbnail image for the video and view count.

34. Mr. Hormozi also has several posts on his social media explaining how he would build a nose strip business, one of which has over 25,800 views on TikTok and another with 585,000 views on YouTube. Attached as Exhibit P13 are true and accurate copies of these videos.

35. As a result, not only is Mr. Hormozi a well-known media personality and social media influencer in these fields, but he is particularly well-known among his followers for wearing nose strips in public and as an advocate for the use of nose strips.

36. Mr. Hormozi has made no secret that he intends to launch his own nose strip and wellness brand that will substantially utilize his name and likeness to channel this well-known consumer identification into a brand that he can control, and which will be strongly connected to this deliberately crafted public image.

37. Mr. Hormozi has spent several years and millions of dollars building a valuable brand in his name and likeness, including by building the aforementioned online presence, giving public speeches, and otherwise establishing his name and likeness as a well-known brand among the aforementioned consumers. Attached here as Exhibit P14, and shown below, is a true and accurate depiction of Mr. Hormozi, which the consumers described within this Verified Complaint recognize and can distinguish.



**B.      Hostage Tape Attempts to Work with Alex Hormozi both as a Knowledgeable Businessperson and as a Celebrity Endorser.**

38. Neist Media, LLC was formed in 2020 under the laws of Minnesota.

39. On information and belief, Neist Media, LLC launched its "Hostage Tape" brand and products, including by selling nose strip and mouth tape products to the public, on February 14, 2022, based on their social media history, the fact that it

appears that they first had a website from which customers could purchase the product in early 2022, and based on the fact that Neist Media, LLC has applied for several federal trademark registrations for the mark "Hostage Tape" and sworn in each application that its first use in commerce of this mark was February 14, 2022, including in application serial numbers 97501517, 97939085, 98002349, 97939080, 98002350, 98002353, 97939076, 98002329, 98002344, 98002346, and 97939072.

40. In February of 2023, Hostage Tape filed with the Secretary of State of Minnesota a fictitious name or "doing business as" certificate for "Hostage Tape."

41. As a young business and brand, Hostage Tape has substantially fewer followers on social media and other online platforms as compared to Mr. Hormozi. For example, as of the date of this Verified Complaint, Hostage Tape has around 2,800 followers on YouTube, 11,000 followers on Facebook, 73,000 followers on Instagram, 5,800 followers on X (Twitter), and 35,000 followers on TikTok.

42. On information and belief, Hostage Tape's total revenue for 2023 was around fourteen million dollars.

43. On information and belief, the members of Hostage Tape, Neist and Read, founded Hostage Tape, and are growing Hostage Tape, with the hope of "exiting" the business, or selling their respective interests, in 3-5 years after scaling its revenue significantly from that fourteen million dollar figure, and have relied and will continue to rely substantially or entirely on internet sales and internet-based marketing, including on all of the social media and online platforms already

identified in this Verified Complaint, as well as their website. This strategy and these figures were mentioned by Neist and Read in a Zoom conference with Mr. Hormozi, which is described in further detail below.

44. Neist recently confirmed this in an interview with the marketing news website "Modern Retail," in which he projected revenue of $40 million dollars for 2024 for Hostage Tape. Attached as Exhibit P14-1 is a true and accurate copy of this article.

45. With this strategic vision in mind and the fact that Mr. Hormozi's following and target demographic substantially overlaps with the target demographic of Hostage Tape, Neist and Read repeatedly solicited Mr. Hormozi in 2023, and eventually, Mr. Hormozi responded to their solicitations after they sent to him a package of samples in the mail. Mr. Hormozi responded to this solicitation specifically because he saw it as an opportunity to shortcut the launch of his planned nose strip business and brand, which, as previously discussed, he had publicly described in various online platforms.

46. The parties began discussions on the basis of the potential synergies that their partnership could create. Hostage Tape already had the manufacturing set up, although Mr. Hormozi would work with them on improving the product's quality. Mr. Hormozi could provide the knowledge and advice needed to scale the business and Mr. Hormozi could leverage the well-known association of his name and likeness with nose strips in the minds of potential consumers, especially among

10

males ages 25-35—Hostage Tape's target demographic and Mr. Hormozi's primary following.

47. These discussions unfolded over several months in direct messages between Mr. Hormozi and Neist on Instagram and included a one hour and forty minute face-to-face recorded Zoom conference involving Mr. Hormozi, his wife Leila Hormozi, Neist, and Read, which recording Mr. Hormozi has preserved. Attached as Exhibit P15 is a true and accurate depiction of the complete direct messages between Mr. Hormozi and Neist on Instagram.

48. In both the Zoom call and in those messages, Mr. Hormozi gave various kinds of advice on how to improve the Hostage Tape product and its business, and Defendants implemented several of the suggestions that Mr. Hormozi gave.

49. In fact, during their Zoom call Neist described Mr. Hormozi as an "expert" on nose strips, and therefore, he solicited Mr. Hormozi's advice on a variety of issues relating to the quality, pricing, and marketing of the nose strips. Neist and Read later used Mr. Hormozi's advice to improve their product, both because they were good suggestions and because Mr. Hormozi told Neist and Read that he would only consider becoming a partner and endorser of the Hostage Tape brand by licensing his name and likeness to Hostage Tape if he believed that quality of the product was in-line with Mr. Hormozi's brand.

50. Indeed, Mr. Hormozi conveyed to Neist and Read that he had never put his name or likeness on a product other than his own, and therefore, Mr. Hormozi was

especially concerned that he protect his personal brand from being debased by an inferior product.

51. For their part, both Neist and Read, and therefore, Hostage Tape, repeatedly expressed to Mr. Hormozi the significant value that the use of his name and likeness would provide to Hostage Tape. For instance, Neist said to Mr. Hormozi, "I want your reach, I want you," stressing that Hostage Tape needed "somebody that is extremely visible who is always wearing Hostage nose strips." In other words, Defendants wanted consumers to believe that Mr. Hormozi was connected, associated, affiliated with, or an endorser of Hostage Tape products.

52. This could not have been any clearer when, in social media messages between Mr. Hormozi and Neist, Neist said, "Im [sic] looking at you as a face for distribution."

53. As a result of these discussions, Neist and Mr. Hormozi discussed potential transaction structures whereby Mr. Hormozi would become a partner and celebrity endorser of Hostage Tape in exchange for a percentage ownership of Hostage Tape and royalty payments.

54. Indeed, Neist emphasized during these discussions that he greatly valued a potential association with Mr. Hormozi to become the "face of the brand" for Hostage Tape.

55. During these discussions, Neist and Read created a mockup of packaging for Hostage Tape that depicted Mr. Hormozi's face on the packaging (the "Hormozi Packaging"), and Neist shared it with Mr. Hormozi via text message. Attached as Exhibit P16 is a true and accurate depiction of the "Hormozi Packaging," and

attached as Exhibit P17 is a true and accurate depiction of the portion of the social media messages in which Neist shared the mockup packaging with Mr. Hormozi.



56. Mr. Hormozi was flattered by this mockup, but he did not give permission to Hostage Tape to use it in any way, since negotiations were still ongoing and Mr. Hormozi and Hostage Tape had reached no agreement.

57. In the course of their discussions, Neist proposed an offer in which Hostage Tape would give a portion of each sale of nose strips for six months to a year to Mr. Hormozi in exchange for the use of Mr. Hormozi's name and likeness (among other things), and then after that term, Hostage Tape would give Mr. Hormozi a percent ownership of the company with the actual percentage to be determined based upon sales.

58. Neist projected Hormozi could bring in an additional $150,000 in revenue per month for Hostage Tape if Hormozi was affiliated with the brand, and thus, on information and belief, Hostage Tape was willing to offer Hormozi 20% ownership of Hostage Tape after the royalty period.

59. Having completed several deals in which Mr. Hormozi partnered with and helped substantially scale various businesses, Mr. Hormozi knew that the value of his brand's association with Hostage Tape was closer to 50% of the ownership of the Hostage Tape business.

60. The parties were unable to bridge the gap and ultimately came to no agreement.

61. With no agreement with Mr. Hormozi in sight, the Defendants caused an advertisement to run on Instagram, and possibly other social media platforms, selling Hostage Tape products by using the Hormozi Packaging that Mr. Hormozi never gave them permission to use. Mr. Hormozi was troubled when he discovered this advertisement, and quickly demanded the Defendants cease using his name and likeness to sell their products. Attached as Exhibit P18 is a true and accurate depiction of the portion of the social media messages between Mr. Hormozi and Neist showing the advertisement and related conversation between them.

62. As illustrated in that Exhibit, Neist insisted that they ran this advertisement in error, but on information and belief, the Defendants did so intentionally. They only removed it because Mr. Hormozi discovered the advertisement and demanded that they take it down.

63. Indeed, Hostage Tape has a history of using other well-known intellectual property that does not belong to them and for which they would require a license, and which, on information and belief, they obtained no such license. These advertisements included an advertisement selling Hostage Tape products using world famous intellectual property from the media franchise *Star Wars*, including

14

the world-famous trademarks "Luke Skywalker," "May the Force be with You," "Darth Vader," and the "Resistance." Likewise, Hostage Tape also ran social media advertisements using well-known quotes and otherwise using the IP of the famous movie series *Anchorman*, starring Will Ferrell, and the famous movie *Scarface*, starring Al Pacino. Attached as Exhibit P19 are true and accurate depictions of these advertisements. On information and belief, Hostage Tape ran these advertisements for several months, and Hostage Tape only stopped using the famous intellectual property after they retained intellectual property counsel and were advised to stop running such clearly infringing advertising.

64. On information and belief, the Defendants believed that this conduct was acceptable since they never actually used the words "Star Wars," "Anchorman," or "Scarface," even though the other terms they used were plainly associated with each of these franchises and designed to draw an association, affiliation, or endorsement in the minds of consumers that would no-doubt recognize these famous brands in Hostage Tape's advertising.

65. Later in 2023, the Defendants tried a second time to utilize Mr. Hormozi's brand to sell their products, but this time in a more creative and broadly implemented way. The Defendants created a new image that looked nearly, but not 100% exactly, like Mr. Hormozi, and then they used this new image heavily in the Hostage Tape ecosystem, including on all of Hostage Tape's product packaging for both nose strips and mouth strips, as its "badge" or "avatar" on all of its social media, and on t-shirts and hoodies. Such use continues to this day. Attached as

15

Exhibit P20 are true and accurate depictions of these products, advertisements, and social media uses. Shown below is a true and accurate side-by-side depiction of Mr. Hormozi and an accurate depiction of one such product packaging using Mr. Hormozi's likeness.



66. After discovering this new use of his likeness by Hostage Tape, Mr. Hormozi again messaged Neist and demanded that the Defendants stop using his likeness. Mr. Hormozi was willing to let Hostage Tape finish selling off the products with the offending packaging it already purchased, if they ceased using his likeness in their advertising, even though he had no obligation to extend this courtesy. After such products were sold, Mr. Hormozi demanded that the Defendants entirely stop using his likeness and brand. Indeed, Hostage Tape should have no issue with simply using a model with a stylized depiction that looks nothing like Mr. Hormozi. Attached as Exhibit P21 is a true and accurate depiction of the portion of Neist and Mr. Hormozi's text messages reflecting this conversation.

67. Incredibly, Neist insisted that the new image looked "nothing like" Mr. Hormozi.

68. Thereafter, Mr. Hormozi retained undersigned counsel, and through him, Mr. Hormozi sent the letter attached as Exhibit P22 to Hostage Tape and Neist.

69. In reply, Hostage Tape, through counsel, sent a letter in response which is attached as Exhibit P23.

70. In that letter, Hostage Tape, through counsel, again insisted that its new branding looked nothing like Mr. Hormozi and claimed that it was derived from artificial intelligence prompts that Hostage Tape staff, including on information and belief, Neist and Read, had provided. Below is a true and accurate side-by-side depiction of Mr. Hormozi, the new offending product packaging, and the AI model that Hostage Tape alleged that it used.



71. Significantly, while the letter showed a new model that did not look like Mr. Hormozi, it showed that model without the artistic filter that Hostage Tape also applied to make the resulting image look substantially similar to or exactly like Mr. Hormozi.

72. Hostage Tape also claimed, through counsel, that it gave its staff specific direction that the depiction should not look like Mr. Hormozi. This claim is a peculiar direction and strains credulity. In the spectrum of people who do not look like Mr. Hormozi, it is odd that they chose a result that looks like a stylized version of Mr. Hormozi. On information and belief, Defendants never actually gave this direction, or if they did, it was done with the implicit or separate understanding that the designers of this branding should come as close as they could to Mr. Hormozi's likeness while maintaining some modicum of plausible deniability that the likeness was *exactly* the same. Such a direction, if it was given, is based on the misguided notion that either intention or exactness make any material difference under the law.

73. Hostage Tape's response letter referred to the art style that Hostage Tape had used as the same style used by the artist Shepard Fairey in a series of guerrilla street art and graffiti depicting the famous professional wrestler and actor Andre Roussimoff, better known as "Andre the Giant."[1] Attached as Exhibit P24, and depicted below, is a side-by-side comparison of this famous artwork next to a true photographic representation of the famous wrestler/actor Andre the Giant. Notably, any reasonable observer can see that the art style and the close-up view used by the artist removes significant features of Andre the Giant as he would look

---

[1] For a more complete discussion of this famous street art, *see* "Andre the Giant has a Posse," https://en.wikipedia.org/wiki/Andre_the_Giant_Has_a_Posse, last accessed 6/27/2024.

in real life, *e.g.*, his hair along with significant facial features. Even so, it still looks like Andre the Giant.



74. Even though such stylization would remove any features that might distinguish the AI model that Hostage Tape claims that it used from Mr. Hormozi's likeness, Hostage Tape, according to this explanation, still applied that stylization and cropped the image, all of which resulted in a stylized model that looks nearly identical to Mr. Hormozi in a stylized form rather than an image that is materially different. This conduct continued Hostage Tape's pattern of using intellectual property belonging to others on the mistaken belief that they had approached but not crossed a line. Among other things, based on their response letter, it appears that Hostage Tape wrongly believes that because it allegedly did not directly copy an image of Mr. Hormozi, this fact insulates them from liability.[2]

75. Indeed, as Mr. Hormozi's demand letter pointed out, there was evidence of actual confusion in the marketplace, which Hostage Tape was intentionally encouraging.

---

[2] Mr. Hormozi does not assert that Hostage Tape's explanation is true, himself having no personal knowledge of the development process. Therefore, he leaves it to discovery and the litigation process to determine how Hostage Tape's new branding came to be.

For instance, attached as Exhibit P25 is a true and accurate depiction of a LinkedIn post, which Mr. Hormozi's demand letter mentioned, in which LinkedIn user Michael McHoul suggests that Mr. and Mrs. Hormozi may be affiliated with Hostage Tape, and the official Hostage Tape LinkedIn account responded, using its Alex Hormozi avatar, with "#shutyourmouth."

76. In the realm of Lanham Act false endorsement—essentially, trademark law—the question is whether a hypothetical reasonable consumer would have a likelihood of confusion, and no consumer would know (or have the ability to know) how Hostage Tape developed its branding, thus making Hostage Tape's explanation legally irrelevant.

77. Defendants plainly know that consumers will think this and hope to trade off the appearance of an association, affiliation with, or endorsement by Mr. Hormozi where none exists, thereby achieving what they hoped to achieve when they tried to form a business relationship with Mr. Hormozi. Indeed, on information and belief, Defendants have specifically paid to display advertising in Google's search results whenever someone searches for the terms "Hormozi" and "nose strips" together, or similar terms, on the hope that people that enter those search terms will see their product with Mr. Hormozi's likeness, and thereby intend for such consumers to draw that association, affiliation, or endorsement in their minds.

78. Having resigned himself to the fact that Defendants would not stop using his likeness, Mr. Hormozi endeavored to gather even more evidence to bolster the very simple notion that any reasonable person could see: that this image still

looked substantially similar or identical to Mr. Hormozi, especially considering its stylized form.

**C.**   **Mr. Hormozi Commissions a Consumer Survey That Provides Damaging Evidence of Actual Confusion Among Potential Consumers.**

79. Subsequently, through counsel, Mr. Hormozi hired Dr. Jesse Catlin to conduct a consumer survey to determine whether actual confusion exists among an appropriate consumer demographic.

80. Dr. Catlin is the Chair of the Department of Marketing and Supply Chain Management and Professor of Marketing in the College of Business at California State University, Sacramento. He has significant education, training, and experience that qualifies him as an expert in brand identity, marketing, consumer behavior, trademark damages, and other relevant fields of study. Attached as Exhibit P26 is a true and accurate copy of Dr. Catlin's Preliminary Report which includes a copy of his Curriculum Vitae, and which establishes him as an expert in these fields.

81. Dr. Catlin designed and conducted a consumer survey of 1001 males aged 25-35 to determine whether actual confusion exists regarding Mr. Hormozi's association, affiliation, or endorsement of Hostage Tape's nose strip product based on the product's packaging. Exhibit P26 includes a printed depiction of the survey and a preliminary expert report and opinion of that study, and Exhibit P27 is his declaration swearing to the veracity of this preliminary expert report and the allegations in this Section C.

82. Dr. Catlin chose males aged 25-35 because, according to Mr. Hormozi, this is substantially his target demographic, and further, because other evidence strongly suggests that Hostage Tape targets this same demographic. For example, Hostage Tape is now the "official sleep partner" of UFC, or the Ultimate Fighting Championship, and publicly available data about UFC viewers establishes that this is the target demographic of UFC. Therefore, Dr. Catlin concluded that this represents a significant cross-section of consumers for both Alex Hormozi and Hostage Tape's nose strips and consumers situated in this group could have a reasonable prospect of encountering content from both entities in the marketplace.

83. Dr. Catlin designed the survey as a "Squirt" or "lineup" study,[3] comparing Hostage Tape's nose strip product packaging next to images of various people, including Mr. Hormozi, with the other people serving as an experimental control. The survey asked each respondent if he thought that there was an affiliation, association, or endorsement of the product with each image (answer choices of "Yes", "No", or "I'm not sure"). Each image was displayed in a random order. The survey also asked, among other questions, how likely respondents believed there was an affiliation, endorsement, or business association with the product on a scale of 1 to 7 (scale labels of: 1 - Extremely unlikely, 2 - Moderately unlikely, 3 - Slightly unlikely, 4 - Neither likely nor unlikely, 5 - Slightly likely, 6 - Moderately likely, 7 - Extremely likely). Nearly half of respondents said "Yes" that they

---

[3] This is a well-known form of consumer survey, accepted by federal courts, first described in *Squirtco v. Seven-Up Co.*, 628 F.2d 1086 (8th Cir. 1980).

believed that there was an association, affiliation, or endorsement between Alex
Hormozi and Hostage Nose Strips. Further, nearly half of survey respondents rated
their perceived likelihood of an association between Alex Hormozi and Hostage
Nose Strips as "moderately likely" or "extremely likely." This is not intended to
be a full description of Dr. Catlin's preliminary findings, which are attached.
These statistics show why Dr. Catlin concludes that there is "clear and convincing
evidence" of actual confusion among potential consumers in the relevant
consumer demographic. In other words, the survey results suggest that a
substantial portion of males ages 25 to 35 would be likely to think that Mr.
Hormozi is associated, affiliated with, or an endorser of Hostage Tape's nose
strips product based upon Hostage Tape's use of Mr. Hormozi's likeness on the
product packaging.

84. Having obtained significant market data of actual confusion—on top of the
already elementary conclusion that a reasonable juror could conclude a likelihood
of confusion exists even absent this study—Mr. Hormozi was forced to bring this
action.

### COUNT I
### LANHAM ACT FALSE ENDORSEMENT
### VIOLATION OF 15 U.S.C. § 1125(a)

85. The preceding paragraphs are incorporated by reference.

86. Mr. Hormozi owns a legal protectable mark recognized under the Lanham Act,
namely, his name and likeness.

87. The facts alleged establish that Hostage Tape, Neist, and Read's conduct violate 15 U.S.C. § 1125(a) by creating a likelihood of confusion in the marketplace that Mr. Hormozi is connected, affiliated, associated with, or an endorser of Hostage Tape and its products by using Mr. Hormozi's likeness in commerce in association with their products without Mr. Hormozi's permission, both when they used his likeness on the Hormozi Packaging and later with the modified image on their products, in their social media, and in their advertising.

88. The facts establish a likelihood of confusion in the marketplace for each use, in light of the relevant factors, including but not limited to (1) the strength of the trademark (in this case, Mr. Hormozi's likeness); (2) the similarity between the parties' marks; (3) the competitive proximity of the parties' products; (4) the alleged infringer's intent to confuse; (5) evidence of actual confusion; and (6) the degree of care reasonably expected of potential customers.

89. Mr. Hormozi is well-known, at least among the niche demographic which both Mr. Hormozi and Hostage Tape target, and further, Mr. Hormozi has a significant online presence amounting to millions upon millions of potential consumers that are aware of him, and therefore his mark is strong.

90. A simple eye test shows that Hostage Tape's branding looks significantly like or nearly identical to Mr. Hormozi—accounting for its stylized nature—and therefore the second factor also weighs in Mr. Hormozi's favor.

91. Although "proximity of the parties' products" would not typically be relevant in a false endorsement case, in this case this factor weighs in favor of Mr. Hormozi

since he has a strong association with nose strips, promotes their use generally, and has publicly said he intends to launch a nose strip business and brand.

92. There is sufficient evidence from which a reasonable juror can conclude that Hostage Tape intended to create confusion, considering the parties' history and Hostage Tape's history of misappropriating famous intellectual property belonging to others, and therefore the fourth factor weighs in favor of Mr. Hormozi.

93. The consumer survey commissioned by Dr. Catlin is convincing evidence of actual confusion in the marketplace, and therefore the fifth factor weighs in favor of Mr. Hormozi.

94. Because nose strips are a relatively inexpensive item, one would not expect a consumer to be particularly discerning about a celebrity endorsement, and therefore the sixth factor weighs in Mr. Hormozi's favor.

95. Additionally, Defendants' spurious payment to show advertising in Google for use of the terms "Hormozi" and "nose strips," or like terms, further demonstrates their intent to exploit Mr. Hormozi's name and likeness, and, is itself, an unlawful use of Mr. Hormozi's name in violation of the Lanham Act.

96. Taken together, all relevant factors establish a likelihood of confusion.

97. Moreover, the use of Mr. Hormozi's likeness is a "spurious" or "counterfeit" mark as set forth in 15 U.S.C. § 1117(b) and § 1117(c).

98. Moreover, the facts alleged support the conclusion that this conduct was "willful" as set forth in 15 U.S.C. § 1117(c)(2).

99. As a result of this wrongful conduct by Hostage Tape, Neist, and Read, Mr. Hormozi is entitled to an order granting him both preliminary and permanent injunctive relief.

100. As a result of this wrongful conduct by Hostage Tape, Neist, and Read, Mr. Hormozi is entitled to actual damages, disgorged profits, treble damages under 15 U.S.C. § 1117(b), and statutory damages under 15 U.S.C. § 1117(c).

101. Mr. Hormozi is further entitled to recover attorneys' fees, under either 15 U.S.C. § 1117(a) or 15 U.S.C. § 1117(c), as well as his costs and pre- and post-judgment interest.

102. Mr. Hormozi is entitled to any further relief the Court deems just and proper.

## COUNT II
## MISAPPROPRIATION OF THE RIGHT OF PUBLICITY
## UNDER MINNESOTA LAW

103. The preceding paragraphs are incorporated by reference.

104. Mr. Hormozi has the exclusive right to the commercial use of his name and likeness that is recognized under Minnesota law.

105. The facts alleged likewise represent the unlawful use of Mr. Hormozi's name and likeness by Hostage Tape, Neist, and Read in a commercial manner and without Mr. Hormozi's permission.

106.     Further, the facts alleged establish that Defendants engaged in the

misappropriation of Mr. Hormozi's name and likeness intentionally, knowingly,

willfully, or with reckless disregard to his rights.

107.     Given the above, Mr. Hormozi is entitled to preliminary and permanent

injunctive relief, and further, both actual and punitive damages for this conduct.

108.     Mr. Hormozi is entitled to actual and punitive damages in excess of

$75,000.

109.     Mr. Hormozi is also entitled to his costs, pre- and post- judgement interest,

and any other relief the Court deems just and proper.

## PRAYER FOR RELIEF

Based on the foregoing, Mr. Hormozi respectfully requests this Court do the following:

(1)     enter judgment in his favor on all Counts;

(2)     grant Mr. Hormozi both a preliminary injunction and a permanent injunction

prohibiting the use of his likeness by Defendants;

(3)     order Defendants to pay Mr. Hormozi his actual damages in an amount to be

determined at trial;

(4)     order Defendants to provide an accounting of all profits they have earned by

both the sale of all offending products and during the period of time Hostage

Tape has used the offending social media avatar or badge, and order that those

profits be disgorged and paid to Mr. Hormozi;

(5)     order Defendants to pay treble Mr. Hormozi's actual damages as provided by

15 U.S.C. § 1117(b);

(6)     order Defendants to pay statutory damages for willfully using a counterfeit mark in violation of 15 U.S.C. § 1117(c)(2), or alternatively, statutory damages as set forth in 15 U.S.C. § 1117(c)(1);

(7)     order Defendants to pay attorney's fees under the Lanham Act;

(8)     order Defendants to pay punitive damages to the maximum extent permitted by law;

(9)     order Defendants to pay all costs and pre- and post- judgment interest;

(10)    order that Defendants are liable jointly and severally; and

(11)    order any other relief the Court deems just and proper.

WHEREFORE, Plaintiff respectfully requests that this Court grant the relief requested, and further, that it grant a jury trial on all issues so triable.

Respectfully submitted,

**HENSON & EFRON, P.A.**

Dated: August 12, 2024

*/s/ Benjamin J. Hamborg*

Benjamin J. Hamborg, #395401
225 South Sixth Street, Suite 1600
Minneapolis, MN 55402
Telephone: (612) 339-2500
bhamborg@hensonefron.com

and

**DARKHORSE LAW PLLC**

/s/ Andrew P. Connors

Andrew P. Connors, Esq. (VSB No. 80248)
*Pro Hac Vice Motion Pending*
119 Tradewynd Dr., Suite B
Lynchburg, VA 24502
Phone: 540-553-8149 ext. 2
Fax: 540-301-6460
andrew@darkhorse.law

*Counsel for Plaintiff Alex Hormozi*

## <u>VERIFICATION</u>

I, Alex Hormozi, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, to the best of my knowledge and belief, except for any facts alleged on information and belief, and except the facts relating to the consumer survey conducted by Dr. Jesse Catlin as set forth in paragraphs 79-84.

_____

Alex Hormozi

08 / 08 / 2024

_____

Date