EXHIBIT P1



EXHIBIT P2



EXHIBIT P3





**hormozi** ✔

Follow  Message

**2,130** posts    **2.7M** followers    **335** following

**Alex Hormozi**

🧵 hormozi

Entrepreneur

Day Job: I invest and scale companies at Acquisition.com | Co-Owner, Skool.com

Side Hustle: I show how we do it... more

🔗 **acquisition.com**

Followed by **mosaiccollective_** and **christianbelcher_realtor**

EXHIBIT P4



# Alex Hormozi ✔

@AlexHormozi · 2.51M subscribers · 2.7K videos

Day Job: I invest and scale companies at Acquisition.com | Co-Owner, Skool. ...more

acquisition.com

**Subscribe**

EXHIBIT P5



# Mozi Media

@mozimediaofficial · 97.5K subscribers · 2.2K videos

The official third channel for Alex & Leila Hormozi. ...more

acquisition.com and 2 more links

Subscribe

EXHIBIT P6



EXHIBIT P7



EXHIBIT P8



# ahormozi ✔

Alex Hormozi

**Follow**

**2** Following    **903.1K** Followers    **19.1M** Likes

I scale companies at Acquisition.com
Co-Owner Skool
Business owners click below

🔗 acquisition.com

EXHIBIT P9



EXHIBIT P10



### I Paid Alex Hormozi $55,000...Here's What I Learned

15K views · 2 weeks ago

Timothy Luong

I paid for **Alex Hormozi's** mastermind, so you don't have to. And in this video, I'm sharing the most valuable lessons I received on ...

4K



**stay.focused.culture** • Follow

Original audio

**stay.focused.culture** Success is the only revenge.

Stay Focused

.

Speaker @hormozi

.
.
.
.
.

#Motivation #Discipline #Mentality #Mindset #Gym #Success #StayFocused #AlexHormozi #Hormozi

27w

**fernando_lopezmedina** ✔ Your time on this earth is Limited!

Every day, you must do everything possible to become a better version of yourself!

26w   Reply

**global0g** 👏👏👏👏

26w   Reply

Liked by **frankdavidroquevalencia** and **others**

December 28, 2023

Add a comment...   Post

EXHIBIT P11











**How I'm PASSING $10,000,000 per month...using opportunity vehicles..**

Alex Hormozi
2.43M subscribers

100,210 views  Sep 27, 2021



**REPROGRAM your mind to be rich in 22 minutes....**

Alex Hormozi
2.43M subscribers

1.5M views  2 years ago

EXHIBIT P12



**Why I Wear Nose Strips**



Alex Hormozi
2.51M subscribers

Subscribe

44K · Share · Download · Save · ...

1.2M views · 10 months ago

EXHIBIT P13





How I would launch a nose strip business

585K views

EXHIBIT P14



EXHIBIT P14-1

  **ModernRetail**                    SUBSCRIBE   LOGIN



**The latest news and trends in retail and e-commerce delivered to your inbox daily**

**DIGITAL MARKETING REDUX**   //   MAY 23, 2024

# Hostage Tape is projecting $40M in revenue for 2024 while putting all of its paid media into Meta

By Maria Monteros



Hostage Tape

Despite the emergence of new ad platforms, mouth tape brand Hostage Tape remains bullish with Meta.

The brand, which promotes better sleep through products like mouth tapes, said that it invests the majority of its paid media on Meta platforms like Facebook. Hostage Tape leverages its partnerships with talk shows like "Live with Kelly and Mark" as well as podcasts like "The Joe Rogan Experience" in these ads, where it uses clips of the hosts talking about the brand. Thanks to its strategy, the brand has managed to generate 30 million impressions a month through Facebook and Instagram.

Over the past couple of years, Meta has fallen out of favor for many young brands after Apple's iOS 14 updates impacted marketers' ability to serve targeted ads. But more recently, brands like beauty brand Prose and clothing company Natural Life told Modern Retail in February that Meta's advertising platform has started to stabilize and customer acquisition costs have begun to go down.

In Hostage Tape's case, founder Alex Neist said that the company aims to maintain a $2.5-$3 return per dollar spent on ads, adding that "all my paid media is Facebook."

"Facebook is still hands down the best place to put your money in and get your money out," Neist said. "It's the most consistent, the most reliable — and it's the largest."

Hostage Tape was founded two years ago and currently offers five SKUs, including mouth tapes, nose strips and nasal sticks. Its products are available for purchase on the company website and on Amazon. Hostage Tape's

Neist mainly credits its Meta ad strategy for Hostage Tape's growth. The company generated revenue of about $14 million in 2023, up from $900,000 in 2022. This year, Hostage Tape is poised to produce about $40 million in revenue. The company is completely self-funded.

## Sign up for the Modern Retail Daily Newsletter

Get news and analysis covering the modernization of retail and e-commerce, delivered to your inbox daily.

Business email

Job title

SUBMIT

Due to the company's target customer base, Hostage Tape has focused its partnerships on prominent figures and organizations in the fitness and health space. In April, Hostage Tape was named the official sleep aid partner of UFC (Ultimate Fighting Championship). The company has also tapped podcast host Joe Rogan and talk show host Mark Consuelos to promote the brand.

"I like to only work with people who genuinely use the product and love the product," Neist said. He added that it designates a certain CPM for its partners depending on how many impressions they produce a month.

These partnerships also tie back to Hostage Tape's Meta strategy. The company frequently uses video clips from its partners for its ads and pushes ads to its landing page. Most of its partnerships are paid, and the company frequently sends products to these influential figures. In return for its Meta investment, Hostage Tape has been getting almost a million visitors a month on its site.

Unlike other ad platforms, Meta offers a variety of formats that competitors might not have, said Daniel McCarthy, assistant professor of marketing at Emory University. This includes a greater variety of videos, carousels and interactive posts, for example. Some formats might resonate more with specific demographics, which makes Meta an effective channel for some brands.

However, one of the main criticisms brands often have about Meta advertising is the cost. The investment in Meta ads can be especially hard to justify after Apple's iOS privacy update has hurt the platform's ability to target specific demographics, McCarthy said. In the fourth quarter of 2022, Facebook's CPM was 26% higher than 2020, according to data from Tinuiti. But, in 2023, Facebook's fourth-quarter CPMs declined 27% from 2021.

"The relative inability to measure and to attribute has certainly degraded [Meta's] ability to generate the same sort of return on investment that they had previously," he said. "But that doesn't mean that it's an ineffective channel."

Neist said initially spent seven figures a month on Meta ads when it first launched the business. Once the company began to gain more repeat customers, the brand scaled back its ad spending to six figures a month.

8/7/24, 2:17 PM
Why Hostage Tape is putting all of its paid media into Meta
CASE 0:24-cv-03241-DWF-DTS Doc 1-1 Filed 08/12/24 Page 36 of 135



"I wanted to see how far I could push it," Neist said. "I wanted to see how far I can continue to spend and get dollars back." At this stage of the business, Neist said that he is now focused on running marketing more efficiently. Just last year, Hostage Tape hired a new head of growth to manage this side of the business.

In the near future, the company is eyeing big-box distribution channels. "Our next priority right now is to get into big-box retail. So we're eyeing a Walmart launch for 2025," Neist said.

## Stories like this, in your inbox each morning.

Business email

Job title

SIGN UP



ADVERTISEMENT

Bringing together
media buyers and
brands tapping
into RMNs

REGISTER          September 12
                  New York, NY

8/7/24, 2:17 PM
CASE 0:24-cv-03241-DWF-DTS Doc. 1-1 Filed 08/12/24 Page 37 of 135
Why Hostage Tape is putting all of its paid media into Meta

ADVERTISEMENT

# Marketing Summit

# More in Marketing

NEW ECONOMIC REALITIES

**How apparel brands like Carter's are looking to win**

DIGITAL MARKETING REDUX

**United Airlines is sunsetting the print**

MEMBER EXCLUSIVE

**CMO Strategies: Brands are adjusting their social platform strategies based**


August 31, 2024

As households watch their budgets, some apparel brands are seeing customers become more selective and price-conscious during the back-to-school shopping season. Apparel spending is projected to average about $253 per household during the 2024 back-to-school season.

August 30, 2024

Hemispheres, United Airlines' on-flight magazine, is ceasing its print product, according to sources familiar with the matter.

August 30, 2024

This is the first half of Modern Retail's CMO Strategies report on social media. Among all marketing channels considered in the series, social media continues to dominate. In this report, we examine the strengths and weaknesses of social media's top players.

## Modern Retail+

Join now to gain access to exclusive content, unlimited articles and more.

SUBSCRIBE

## Newsletter

Get Modern Retail's top stories every morning in your email inbox

Business email

SIGN UP

## Connect

Follow @ModernRetail for the latest news, insider access to events and more.

 

EXHIBIT P15

























EXHIBIT P16



EXHIBIT P17





EXHIBIT P18



EXHIBIT P19



Library ID: 880486707049791                    •••

🖉 Inactive

15 Dec 2023 - 2 Jan 2024

Platforms  🅕 📷 Ⓞ 💬

This ad has multiple versions ⓘ

EU transparency ⓘ

See ad details

**Hostage Tape**
Sponsored

Kiss sleeping in the spare bedroom goodbye



WWW.HOSTAGETAPE.COM
See Why THIS Sleep Routine Has EVERYONE Talking                    Shop Now



EXHIBIT P20





★★★★★ 100,000+ Mouth Tapers

# DON'T LET SNORING RUIN YOUR SLEEP

**YOUR SPECIAL BUNDLE HERE**

**HOSTAGE** TAPE    FOUNDER STORY    MOUTHTAPE    NOSESTRIPS    SLEEP QUIZ!    REVIEWS    ACCOUNT  







Short sleeve t-shirt :: Hostage Tape face
$35.00

Short sleeve t-shirt :: Hostage Tape
$35.00

Trucker cap :: Hostage Tape
$34.00





Hoodie :: Hostage Tape
$57.00

Hoodie :: Hostage Tape Face
$57.00



EXHIBIT P21





EXHIBIT P22



**Andrew P. Connors, Esq.**
Licensed in Virginia | andrew@darkhorse.law
Phone (540) 553-8149 ext. 2 | Fax (540) 301-6460

## CEASE AND DESIST, DEMAND FOR ACCOUNTING, AND
## NOTICE TO PRESERVE EVIDENCE

March 6, 2024

Neist Media LLC dba Hostage Tape
Attn: Alex Neist, Manager
6956 Huckleberry Drive
Minnetrista, MN 55331

Via Certified Mail and email via the hostagetape.com contact form

Re: Use of Alex Hormozi's Likeness by Hostage Tape

Dear Mr. Neist:

My firm represents Alex Hormozi in the above-referenced matter. It should come as no surprise that we are writing regarding you and your business' unlawful use of Mr. Hormozi's likeness that is clearly intended to free-ride off Mr. Hormozi's well-known association with nasal strips and similar goods. Therefore, as we detail further in this letter, you must (1) immediately cease and desist the use of Mr. Hormozi's likeness and any imitation or approximation thereof; (2) account fully for all revenues and costs derived from the sale of your nose strips, so that we can then determine the extent of the damages owed to Mr. Hormozi; (3) pay Mr. Hormozi's legal expenses and other costs; (4) disclaim any relationship or affiliation with Mr. Hormozi; and (5) preserve all evidence at all related to this dispute due to impending litigation.

We have reviewed significant evidence that you intend to free ride, and are actually free riding, off Mr. Hormozi's well-known association with nasal strips among the relevant consuming public by confusing such persons into believing that your product and Mr. Hormozi are associated. We reviewed extensive messages on social media in which you attempted to negotiate the use of Mr. Hormozi's likeness in association with your product and the use of his significant online following in exchange for giving Mr. Hormozi an equity stake in your company. When those negotiations failed, you first used an image that was plainly Mr. Hormozi in your social media advertising. When Mr. Hormozi complained to you, you added some mild stylization to the image, but it remained a clear imitation or approximation of Mr. Hormozi's likeness. To add insult to injury, you then added that likeness to all your product packaging, began using it as your "avatar" on social media, and otherwise began using it in nearly all your online advertising. The kind of consumers which are interested in your product tend to be familiar with Mr. Hormozi and his well-known association, at least among that consumer population, with the use of nose strips to help with general quality of life, sleeping, and

breathing. Mr. Hormozi made you aware of the fact that many of these consumers mistakenly believed that Mr. Hormozi was associated with your product, but despite that protest, you ignored Mr. Hormozi's reasonable request to use an image that did not so closely resemble Mr. Hormozi. Sadly, this is not the only intellectual property that you appear to have misappropriated in your marketing—we catalogued ads using various famous IP that you plainly could not have permission to use, including ads that prominently feature well-known IP associated with the Disney Star Wars franchise, the movies "Anchorman" and "Scarface," and others. This only further supports the notion that you have no regard for the intellectual property rights of others and are perfectly comfortable with earning millions of dollars by unlawfully affiliating your product with brands and persons with which you have no actual affiliation. Indeed, it appears whenever a consumer draws the association between your strips and Alex Hormozi, you are willing to only further imply some endorsement or association, like, for example, in the attached screenshot from LinkedIn (Exhibit 1). We also learned that you have previously misappropriated the likenesses of other individuals, some of whom Mr. Hormozi knows personally, to sell your products.

Based on these facts, our client has strong claims against both you and your company for false endorsement, misappropriation of his right of publicity, and other claims. You should note that claims for false endorsement and the misappropriation of the right of publicity do not require you to use an exact representation of Mr. Hormozi's likeness. In both cases, imitations and approximations will suffice. For example, in well-known cases in this field, Bette Midler and Vanna White both successfully sued Ford and Samsung, respectively, even though the defendants used only approximations of the likenesses of those people. Moreover, a Lanham Act false endorsement claim relies upon consumer perception, assessing whether a likelihood of confusion exists in the minds of consumers regarding whether Mr. Hormozi is associated with or endorses your product—and therefore, even if you did not intend to use Mr. Hormozi's likeness does not relieve you of liability. Nevertheless, evidence of intent and actual confusion are relevant and important factors, and the factual history here plainly shows that you intended to trade off Mr. Hormozi's popularity among a niche consumer group that associates him with nose strips. Indeed, when faced with actual evidence of confusion, e.g., on LinkedIn, you did nothing to dispel the association and even fanned the flames by implying an affiliation between your product and Mr. Hormozi where none existed.

You should understand that your blatant misappropriation of Mr. Hormozi's likeness carries with it significant penalties. Under federal law, Mr. Hormozi is entitled to his actual damages (sometimes measured as the cost of acquiring permission to his likeness); disgorged profits; a court order prohibiting your continued use of his likeness; destruction of the offending products; and, in exceptional cases like this one, his costs and attorneys' fees. If he is forced to do so, Mr. Hormozi will pursue these remedies in federal court.

Nevertheless, Mr. Hormozi is prepared to resolve this matter outside of court for the following:

(1) you will immediately cease using Mr. Hormozi's likeness and any imitation or approximation, including by stopping all sales of products with the misappropriated likeness on their packaging;

(2) you will destroy all offending products and other tangible things, and will submit to an inspection process so that we can confirm compliance;

(3) you will provide a full and complete accounting of all revenue earned from all sales from the start of the use of Mr. Hormozi's likeness through the present, and fully account for all uses of his likeness, including by providing data on the number of products produced and sold which bear his likeness;

(4) you will pay Mr. Hormozi a percentage of revenues in an amount to be determined after the accounting (based on the evidence of negotiation available, 20% to 50% appears to be a reasonable percentage);

(5) you will pay Mr. Hormozi's costs and attorneys fees in addressing and resolving this matter, in an amount to be determined once the matter is resolved; and

(6) you will place a prominent disclaimer (which is acceptable to Mr. Hormozi) on your website, on social media, and on your products disclaiming any association with Mr. Hormozi.

This offer is non-binding and is enforceable only when the parties have all signed a written agreement including these and other terms. If you are willing to settle this matter outside of court in a manner consistent with these demands, then Mr. Hormozi will refrain from filing suit while we work out the details. Otherwise, Mr. Hormozi will promptly file suit if you do not confirm to me by email your agreement to these terms in principle by March 15, 2024 at 5 p.m. Eastern time.

Given that a federal lawsuit is likely, please also accept this letter as notice that you have a legal duty to preserve all evidence at all related to this dispute. This includes all documents both tangible and intangible, including electronic documents such as emails, correspondence, social media messages, text messages, phone and computer data, financial information, and product information, and any other thing that may relate to this dispute. Any attempt to destroy evidence will be dealt with swiftly in court and could severely prejudice you with a judge. As you are aware, we already know of a great deal of the information that exists and we will be able to quickly tell of the evidence has been tampered with or destroyed.

Mr. Hormozi hopes that we can resolve this matter outside of court, and he awaits your response to the demands above by the March 15th deadline. Please send your response by email to me at andrew@darkhorse.law.

Darkhorse Attorneys
Page 4 of 5

Sincerely,

Andrew P. Connors, Esq.
Darkhorse Law PLLC


Enclosures: Exhibit 1 – LinkedIn Screenshot
Cc:      Jake Bryant, Esq.; Brock Bales, Esq.; Alex Hormozi

Darkhorse Attorneys
Page 5 of 5
EXHIBIT 1



2:32

← ⋮

**Michael McHoul** · 3rd+
Collectible Industry Social Media, …
1mo · 🌐

+ Follow

I'm going to call it: Alex Hormozi & Leila Hormozi x Hostage Tape has to be happening at some point in 2024 if it isn't already happening behind the scenes. It feels like it's meant to be.
#HostageTape

1 comment

Like | Comment | Repost | Send

**Comments**          Most relevant ⇅

**Hostage Tape**          ⋮
77 followers
1mo
#ShutYourMouth 🤐💪🔥

Like · 🟢 1 | Reply

Leave your thoughts here…          @  Post

||| ◻ ‹

119 Tradewynd Dr., Suite B, Lynchburg, VA 24502 https://darkhorse.law

EXHIBIT P23



Stephen R. Baird
Tel 612.259.9718
Fax 612.677.3101
bairds@gtlaw.com

March 22, 2024

**VIA U.S. MAIL AND EMAIL**

Andrew P. Connors, Esq.
Darkhorse Attorneys
119 Tradewynd Dr., Suite B
Lynchburg, VA 24502

Re:     **Hostage Tape Product Packaging and Social Media Avatar**

Dear Mr. Connors:

This firm represents Neist Media LLC ("Hostage Tape") in intellectual property matters. We write in response to your letter sent March 6, 2024, regarding Alex Hormozi. To be clear, Hostage Tape has not misappropriated Mr. Hormozi's right of publicity or falsely suggested that Mr. Hormozi endorses or sponsors Hostage Tape. Our client will not entertain your aggressive allegations, unwarranted demands, and it is prepared to take all steps necessary to defend itself should you choose to litigate this matter (which would render such actions exceptional), given the facts and controlling law that have been ignored in escalating baseless claims to bully our client.

As a preliminary observation, please know that Mr. Neist harbors no ill will toward Mr. Hormozi. However, your cease-and-desist letter's baseless allegations require a forceful response. In that vein, and to set the record straight, we believe it is important to clarify that your client desired to speak with Mr. Neist to explore a possible collaboration with Hostage Tape® after receiving a package of Hostage Tape® product from Mr. Neist. It was at that time and continues to be a rapidly growing Hostage Tape® business and brand, independent of your client. Moreover, given your baseless claims concerning our client's facial-based branding and packaging elements and social media advertising and promotion, we further believe it is important to clarify that our client has been focused on facial branding long before any discussions with Mr. Hormozi.

By way of example, Hostage Tape's earliest product packaging concepts from January 2022 (which were not released to the public), depict not only two-dimensional applications of Hostage Tape marks and products in black and white, but they are shown in combination with a closely cropped face, in a style loosely based on Shepard Fairey's depiction of André the Giant.

**Greenberg Traurig, LLP | Attorneys at Law**

90 South Seventh Street  |  Suite 3500  |  Minneapolis, Minnesota 55402  |  T +1 612.259.9700  |  F +1 612.677.3101

Albany. Amsterdam. Atlanta. Austin. Berlin. Boston. Charlotte. Chicago. Dallas. Delaware. Denver. Fort Lauderdale. Houston. Las Vegas. London. Long Island. Los Angeles. Mexico City. Miami. Milan. Minneapolis. New Jersey. New York. Northern Virginia. Orange County. Orlando. Philadelphia. Phoenix. Portland. Sacramento. Salt Lake City. San Diego. San Francisco. Seoul. Shanghai. Silicon Valley. Singapore. Tallahassee. Tampa. Tel Aviv. Tokyo. Warsaw. Washington, D.C. West Palm Beach. Westchester County.

Operates as: "Greenberg Traurig Germany, LLP; "A separate UK registered legal entity; "Greenberg Traurig, S.C.; "Greenberg Traurig Santa Maria; "Greenberg Traurig LLP Foreign Legal Consultant Office; "Greenberg Traurig Singapore LLP; "A branch of Greenberg Traurig, P.A., Florida, USA; ᵃGT Tokyo Horitsu Jimusho and Greenberg Traurig Gaikokuhojimubengoshi Jimusho; "Greenberg Traurig Nowakowska-Zimoch Wysokiński sp.k.

www.gtlaw.com

ACTIVE 696347743v1

March 22, 2024
Page 2

Hostage Tape had spent millions of dollars promoting its products for use with men having facial hair, well before any conversation with Mr. Hormozi. For example, at least as early as December 2022, Hostage Tape ran a series of ads on Facebook depicting its distinctively shaped and colored mouth tape on bearded faces with the slogan "Sleep Better Immediately! Beard and All …" Further, in January 2023, Hostage Tape's Co-founder grew a beard to leverage the success of the bearded Facebook ads in a series of original and organic online Hostage Tape content focused on facial hair. All this facial-hair branding predates the discussions with Mr. Hormozi.

### 2022 Prototype Packaging



(January 20, 2022)

### 2022 Facebook Ads



(December 15, 2022)

March 22, 2024
Page 3

**Online Series Using Bearded Hostage Tape Co-Founder**



(January 15, 2023)

On April 6, 2023, after receiving a package of Hostage Tape® product sent by Mr. Neist, Mr. Hormozi contacted Mr. Neist, suggesting he wanted to explore working together. Mr. Neist initially welcomed Mr. Hormozi's interest and engaged in good faith discussions around a potential business relationship. As a gesture of goodwill and with hopes of forming a business relationship, Hostage Tape created a rudimentary graphic of Mr. Hormozi wearing a nasal strip in a style that resembled Shepard Fairey's OBEY image (the "Graphic"). Mr. Hormozi did not object to the Graphic, in fact, he loved it and expressed it was "killer" on May 24, 2023:



Although Hostage Tape did briefly post the Graphic on a landing page to its website (without identifying Mr. Hormozi by name), in doing so, Hostage Tape reasonably believed it had Mr. Hormozi's consent to post the Graphic (without using Mr. Hormozi's name), and as soon as Mr. Hormozi objected to the use, the Graphic was immediately removed.

March 22, 2024
Page 4

The de minimis nature of the brief posting, apparent consent, lack of Mr. Hormozi's name, and the immediate removal of the Graphic upon request obviates any liability. Assuming for the sake of argument that liability could attach, which it will not, your admission that Mr. Hormozi is only casually known to a small, niche subset of the population undermines any claim for damages. *KNB Enterprises v. Matthews*, 78 Cal.App.4th 362, 367 (Cal. Ct. App. 2000) ("the unauthorized appropriation of an obscure plaintiff's name, voice, signature, photograph, or likeness would not inflict as great an economic injury as would be suffered by a celebrity plaintiff").

Your assertion that Mr. Hormozi contributed to Hostage Tape's success, in any way, is pure fantasy. To the contrary, Mr. Hormozi's greed and bloated perspective of his value no doubt has fueled his <u>attempt</u> to leverage Hostage Tape's success to <u>his</u> gain. Having failed in his effort to gain a half or even a third of the Hostage Tape business, Mr. Hormozi now apparently seeks to hold Mr. Neist hostage under a make-believe factual and legal theory.

After experiencing and understanding that Mr. Hormozi would <u>not</u> be a suitable partner, given his bloated perspective of what value he could bring to help grow the Hostage Tape brand and business, Hostage Tape developed an entirely new and original creative design to continue the company's focus on facial hair use. Your assertion that Hostage Tape is using "a clear imitation or approximation of Mr. Hormozi's likeness" is simply ridiculous, as you can clearly see below:

<table>
<tr><td align="center"><b>This is Alex Hormozi</b></td><td align="center"><b>This is NOT Alex Hormozi</b></td></tr>
<tr><td align="center"></td><td align="center"></td></tr>
</table>

Hostage Tape eventually landed on a design that captured the essence of its brand identity. The image was produced with the assistance of generative Artificial Intelligence ("AI") prompted with non-descript phrases such as "evenly lit face serious looking black and white masculine" and "serious looking black and white masculine bearded man." These images were manipulated by the Hostage Tape creative team to reach the final design. Throughout this process, Mr. Neist made clear to Hostage Tape's creative team that it could use "nothing or no one who looked like Mr. Hormozi." Hostage Tape's creative process was scrupulously documented so there would be no doubt as to the origin and originality of Hostage Tape's designs.

March 22, 2024
Page 5

**AI Images**

   

| **Selected Image** | **Edited Image** | **Product Packaging** |
|---|---|---|

  

Your contention that Hostage Tape has misappropriated Mr. Hormozi's likeness or falsely suggested his endorsement is without merit. *See* Restatement (Third) of Unfair Competition § 46 (1995) ("The use must therefore be sufficient to identify the person whose identity the defendant is alleged to have appropriated."); 15 U.S.C. § 1125(a)(1)(A) (a celebrity must show that use of his or her name is likely to cause confusion among consumers as to the "affiliation, connection, or association" between the celebrity and the defendant's goods or services or as to the celebrity's participation in the "origin, sponsorship, or approval" of the defendant's goods or services).

Hostage Tape did <u>not</u> use an image of Mr. Hormozi in creating its current packaging, nor its social media avatar, and the image Hostage Tape did use does <u>not</u> identify Mr. Hormozi or his persona. Your client seems to believe that any graphic representation of a bearded male wearing a nose strip automatically depicts Mr. Hormozi. Obviously, neither the facts nor the law will support that unreasonable claim. Simply put, you've got the wrong guy. And, as the facts shown above demonstrate, the bearded facial graphic and branding that appears on Hostage Tape packaging, advertising, and social media, is clearly <u>not</u> an "imitation or approximation" of Mr. Hormozi.

Putting aside for the moment that none of the cases you rely upon stand for, much less even mention your make-believe "approximation" reference as the test for legal liability, your reliance on *Midler v. Ford Motor Co.*, 849 F. 2d 460 (9th Cir. 1988), is misguided. In *Midler*, the defendant took great care to create a sound-alike performance that was virtually indistinguishable from that of Bette Midler. The defendant hired one of Bette Midler's backup singers, someone who was

March 22, 2024
Page 6

deeply familiar with Midler's unique vocal style. The defendant selected a song that Midler had made famous and then instructed the singer to "sound as much as possible like the Bette Midler record." *Id.* The backup singer's ability to emulate Midler's distinct vocal style was uncanny, and even Midler's close friends could not tell the difference between the two performances.

Your reliance on W*hite v. Samsung Electronics America, Inc.*, 971 F. 2d 1395 (9th Cir. 1992) is likewise unavailing. In *White*, the defendant had taken a great many elements associated with Vanna White and combined them in a manner that directly and unmistakably evoked White's celebrity "identity." The court observed, "[t]he ad depicted a robot, dressed in a wig, gown, and jewelry which [the defendant] consciously selected to resemble White's hair and dress. The robot was posed next to a game board which is *instantly recognizable* as the Wheel of Fortune game show set, in a stance for which White is famous." *Id.* (emphasis added). Further, the court gave great weight to the copious evidence showing that the defendant intended to appropriate White's identity for its commercial benefit and that consumers would "instantly" recognize White's likeness and mistakenly but reasonably believe that White endorsed Samsung. As the court noted, White was the "only one" who could possibly be depicted in the advertisement. *Id.*

In stark contrast, the Hostage Tape facial image is not Mr. Hormozi, nor does it bear an indistinguishable resemblance to him, as clearly shown above. Further, there is no evidence that consumers are familiar with Mr. Hormozi let alone believe he is endorsing Hostage Tape. *See Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619, 627 (6th Cir. 2000) (affirming summary judgment for defendant on false endorsement claim where plaintiff "had offered no evidence with regard to his name recognition among" the relevant buying public). Further still, Hostage Tape did not intend to appropriate Mr. Hormozi's likeness, which is clearly documented throughout Hostage Tape's creative process at the direction of senior leadership. These facts are not in dispute.

The facts quite simply do not support your baseless allegation of "some mild stylization" to the Graphic that was temporarily posted to a landing page on our client's website:

| **Graphic** | **Product Packaging and Social Media Avatar** | |
|:---:|:---:|:---:|

  

March 22, 2024
Page 7

Clearly, no reasonable consumer would identify Mr. Hormozi in the facial images on Hostage Tape® packaging or social media advertising. Moreover, the suggestion that Mr. Hormozi – like Bette Midler or Vanna White – is the "only one" who could be depicted utterly defies not only common sense, but even more importantly, the facts, circumstances, and law set forth above.

In view of the foregoing, Hostage Tape views your demands as patently unreasonable, and it is confident that it will prevail should you choose to expose your client to the likelihood of an order to pay our client's attorney's fees to successfully defend against your client's exceptional claims. This letter is without prejudice to any rights, remedies, or defenses, all of which are hereby reserved. The above is not an exhaustive statement of all relevant facts and laws.

Sincerely,

Stephen R. Baird
Shareholder

EXHIBIT P24




EXHIBIT P25



**Michael McHoul** • 3rd+
Collectible Industry Social Media, …
1mo • 🌐

**+ Follow**

I'm going to call it: **Alex Hormozi** & **Leila Hormozi** x **Hostage Tape** has to be happening at some point in 2024 if it isn't already happening behind the scenes. It feels like it's meant to be.
**#HostageTape**

1 comment

👍 Like    💬 Comment    🔁 Repost    ➤ Send

Comments                         Most relevant ⌄



**Hostage Tape**
77 followers
1mo

**#ShutYourMouth** 😛💪🔥

Like • 🌐 1 | Reply

Leave your thoughts here…    @    Post

EXHIBIT P26

**Preliminary Expert Report**

**of**

**Jesse Catlin, Ph.D.**

**July 15, 2024**

# Table of Contents

I. Introduction and Qualifications ...........................................................................................3

II. Overview of Engagement and Scope ...................................................................................4

III. Survey Purpose and Design ..............................................................................................4

    Images Used in the Survey ..............................................................................................5

        Figure 1 – Side-by-Side Image: Alex Hormozi ......................................................7

        Figure 2 – Side-by-Side Image: Control 1 ............................................................7

        Figure 3 – Side-by-Side Image: Control 2 ............................................................8

        Figure 4 – Side-by-Side Image: Control 3 ............................................................8

    Sampling and Respondents ..............................................................................................9

        Relevant Population for Sample and Justification ................................................9

        Market Overlap and Potential for Confusion ......................................................10

        Sample Size, Recruitment, and Eligibility Criteria ............................................11

    Survey Procedure and Questionnaire ............................................................................13

        Figure 5 – Hostage Nose Strips Packaging ........................................................14

        Sequential Lineup Questions ...............................................................................14

        Simultaneous Lineup Questions .........................................................................15

IV. Survey Results .................................................................................................................15

    Sequential Lineup Results .............................................................................................15

        Table 1 – Sequential Lineup Response Summary ...............................................17

        Open-Ended Responses .......................................................................................18

    Simultaneous Lineup Results ........................................................................................19

        Table 2 – Simultaneous Lineup Likelihood Scale Means and Standard Deviations ..........20

        Table 3 – Simultaneous Lineup Rating Frequencies ...........................................21

V. Summary and Conclusion .................................................................................................22

VI. Appendix 1 – CV of Jesse Catlin, Ph.D. ........................................................................26

VII. Appendix 2 – Respondent Characteristics .....................................................................34

VIII. Appendix 3 – Survey Questionnaire .............................................................................36

# I. Introduction and Qualifications

1.      My name is Jesse Catlin, and I am a Department Chair and Professor of Marketing at California State University, Sacramento. I hold a Ph.D. in Management (emphasis in Marketing) from the University of California, Irvine in addition to an M.A. and B.A. in Economics from California State University, Sacramento. My resume is attached (see Appendix 1). In preparing this report, I draw on my broad array of training, experience, and expertise developed over my career as a university professor and consultant.

2.      I have extensive experience as a consumer and marketing researcher, including designing, fielding, and analyzing surveys, experiments, and other behavioral studies. My publication record includes numerous articles in respected peer-reviewed journals covering a range of topics in marketing and consumer behavior. I was named a Distinguished Winner of the 2020 AMA-EBSCO Award for Responsible Research in Marketing which recognizes "outstanding research that produces both credible and useful knowledge." I am regularly called upon to serve as a peer-reviewer for journals in various disciplines, recognizing the breadth and depth of my expertise in evaluating research methods and statistical analysis.

3.      My teaching experience includes courses at both the undergraduate and graduate levels, including courses on Marketing Strategy, Consumer Behavior, Principles of Marketing, and Pricing. Subject matter I teach in these courses that is relevant to the current matter includes marketing research methods (surveys, experiments, etc.), branding, regulatory issues in marketing, consumer psychology and decision-making, persuasion and influence tactics, and advertising, among others.

4.      I also operate a consultancy called Catlin Research + Consulting. I have previously served as a consulting expert in litigation utilizing my expertise in marketing and survey research methods. My prior work as a consultant also includes various engagements involving marketing research, consumer behavior, branding, and strategy.

5.      My compensation does not depend on the opinions expressed or the outcome of this matter. All opinions expressed are my own.

## II. Overview of Engagement and Scope

6.      I was engaged by Plaintiff's Counsel to provide expert consulting related to claims of false endorsement and consumer confusion involving Mr. Alex Hormozi and Hostage Nose Strips. Specifically, I was asked to conduct a survey and provide analysis and opinions assessing the likelihood that consumers may erroneously perceive an association between Mr. Hormozi's likeness and Hostage Nose Strips based on the product packaging.

## III. Survey Purpose and Design

7.      The Hostage Tape Nose Strips package features what appears to be a gray-colored rotoscoped or similarly filtered image (i.e., a real image that has been converted into an animated version) of an individual with male features wearing a nasal strip. Notably, the image on the packaging and Mr. Hormozi's likeness exhibit striking similarities in terms of facial and other features, leading to Plaintiff's concerns that consumers may incorrectly believe there is an association between the two entities. Accordingly, the key questions to be addressed in this survey were:

1.) Do consumers (incorrectly) believe there is an association between Hostage Nose Strips and Alex Hormozi based on the product packaging, and, if so, to what degree?

2.) How does the degree to which consumers perceive an association between Hostage Nose Strips and Alex Hormozi compare to perceptions of an association between Hostage Nose Strips and other individuals with similar facial characteristics? In other words, is the perception of an association higher specifically for Alex Hormozi compared to other individuals that fit a similar general description (e.g., male with thick facial hair)?

8.      To address these questions, I developed, fielded, and analyzed a variant of what is often referred to as a "lineup study", or "Squirt study," based on the well-known case establishing use of this survey format.[1] In this type of survey, respondents view side-by-side images of the source item (e.g., logo, likeness, product packaging, etc.) along with the alleged infringing item (e.g., logo, likeness, product packaging, etc.) and respond to questions related to whether they believe there is an association between the two entities. The survey described herein features images of individuals (including Mr. Hormozi) along with the Hostage Nose Strips packaging.

**Images Used in the Survey**

9.      As the basis for this survey, a series of four side-by-side images were created that featured an image of the Hostage Nose Strips packaging and a person. As shown below, one of the side-by-sides featured Alex Hormozi. The image used was one that has been widely available across various online platforms (e.g., Instagram, LinkedIn, YouTube, etc.) for an extended

---

[1] Squirtco v. Seven-Up Co., 628 F.2d 1086 (8th Cir. 1980).

period and depicts Mr. Hormozi's typical appearance. Although Mr. Hormozi is well-known for wearing nose strips and frequently discusses them in the content he creates (social media posts, podcasts, etc.), the image used in the survey did not feature a nose strip to prevent bias or any undue leading of respondents in drawing a connection between his likeness and the Hostage Nose Strip packaging. Thus, the results of the survey can be viewed as conservative compared to the numerous highly plausible marketplace situations where a consumer might encounter content with Mr. Hormozi wearing and/or discussing nose strips.

10.     Three additional control side-by-sides were created using stock images of individuals who also have long hair and thick facial hair. These images served as comparisons to assess whether any perceived association between Hostage Nose Strips and Alex Hormozi exceeds the perceived association between Hostage Nose Strips and other individuals who share similar general features of long hair and thick facial hair.

*Figure 1 – Side-by-Side Image: Alex Hormozi*



*Figure 2 – Side-by-Side Image: Control 1*

 

*Figure 3 – Side-by-Side Image: Control 2*



*Figure 4 – Side-by-Side Image: Control 3*



**Sampling and Respondents**

*Relevant Population for Sample and Justification*

11.     For consumer confusion to occur, there has to be a reasonable prospect that consumers could be exposed to marketing or other content from both entities. In other words, in the course of normal marketplace interactions, there are consumers who could encounter content from both Mr. Hormozi and Hostage Nose Strips, which could lead to potential confusion about an association between the two entities. Therefore, an important initial step is to identify what, if any, overlap exists when it comes to consumer segments targeted by Mr. Hormozi and Hostage Nose Strips. Consumers in these groups would be most relevant to query when assessing potential confusion about a false endorsement.

12.     I was advised by Plaintiff's representatives that a typical profile of a consumer of Mr. Hormozi's content is a male between the ages of 25 and 35 and my own review of his online presence indicates that this is a reasonable characterization. Importantly, this coincides with the profile of a key consumer segment targeted by Hostage Nose Strips. As an illustration of this overlap, Hostage Nose Strips recently announced a large marketing deal with the Ultimate Fighting Championship (UFC).[2,3] Data suggest that a major portion of fans of combat sports (e.g., UFC) in the United States are males between the ages of 25 and 35[4]; thus, this relationship between UFC and Hostage Nose Strips is highly suggestive that, like Mr. Hormozi, Hostage

---

[2] Lefton, T., "UFC Taps Hostage Tape as Official Sleep-Aid," (April 2, 2024), Sports Business Journal, https://www.sportsbusinessjournal.com/Articles/2024/04/02/ufc-hostage-tape.
[3] "Ultimate Fighting Championship (UFC), UFC Names Hostage Tape Official Sleep Aid Partner," (April 1, 2024), https://www.ufc.com/news/ufc-names-hostage-tape-official-sleep-aid-partner?language_content_entity=en.
[4] Morning Consult, National Tracking Poll #2305095, (May 16-18, 2023), https://pro-assets.morningconsult.com/wp-uploads/2023/05/2305095_crosstabs_MC_SPORTS_SPORTS_CALENDAR_Adults.pdf (pg. 50).

Preliminary Expert Report of Jesse Catlin, Ph.D.                                          9

Nose Strips views males ages 25 to 35 as an attractive target market for their product. Similarly, a related product marketed by the Hostage brand, Hostage Mouth Tape, has been promoted in partnership with podcast host, Joe Rogan[5], whose listeners in the United States tend to be males and frequently fall within the 25 to 35 age range.[6,7]

13.     Based on this data and my own expertise, I find that males ages 25 to 35 in the United States represent an appropriate group to survey regarding potential confusion given that they fit the profile of consumers likely to be targeted by both Mr. Hormozi and Hostage Nose Strips. Further, recruitment from an online panel and completion of the survey online is particularly appropriate in this situation given that both Mr. Hormozi and Hostage Nose Strips primarily market and sell their products/services online. Further, the attempted engagement of Mr. Hormozi as an endorser and business partner reinforces the idea that Hostage Nose Strips seeks to target consumers who fit the profile of Mr. Hormozi's target audience.

*Market Overlap and Potential for Confusion*

14.     Importantly, the extent of the overlap between the target markets and reliance on similar digital marketing channels for both entities establishes a strong likelihood that an individual consumer would be likely to encounter content from both Mr. Hormozi and Hostage Nose Strips. That is, there is ample likelihood that males ages 25 to 35 could be exposed to content from both Hostage Nose Strips and Mr. Hormozi (including through the same online platforms, e.g.,

---

[5] "5 Reasons Why Joe Rogan & UFC Use Hostage Tape," https://hostagetape.com/pages/rogan
[6] "Who is Joe Rogan's audience?", (March 22, 2022), Unherd,  https://unherd.com/newsroom/who-is-joe-rogans-audience/.
[7] Yokley, E., "Few Politicians Have Appeared on Joe Rogan's Podcast. But Data Shows They Should Be Targeting His Fans," (March 14, 2022), Morning Consult, https://pro.morningconsult.com/trend-setters/joe-rogan-fans-demographics-political-messaging-persuasion.

Instagram). As a result, it is my view that the potential for consumer confusion to occur naturally in the marketplace is clearly established for males ages 25 to 35 living in the United States and thus this group represents an appropriate population for the survey.

*Sample Size, Recruitment, and Eligibility Criteria*

15.     Using population data from the United States Census, I estimate that there are approximately 25.3 million males ages 25 to 35 in the United States.[8] For a population of 25.3 million, to achieve a survey with a confidence level of 95% and a 3.5% margin of error, the recommended sample size is 784 based on commonly used calculation methods.[9] In order to enhance representativeness and precision, I aimed for a sample size of about 1,000 survey respondents in total.

16.     Survey respondents were recruited from CloudResearch Connect.[10] CloudResearch Connect maintains a large panel of participants and has been consistently found to be a high-quality data source, with industry-leading vetting of participants and quality control measures.[11] Independent studies also suggest participants recruited through CloudResearch platforms

---

[8] Census data are provided for ages ranges, such as the number of males ages 25 to 29 years, 30 to 34 years, and 35 to 39 years (see Annual Estimates of the Resident Population for Selected Age Groups by Sex for the United States) which does not correspond directly to the age range of 25 to 35 used for this survey. I calculate estimates for the age range of 25 to 35 by combining the data for the ages 25 to 29 and ages 30 to 34 categories along with one-fifth (20%) of the number of individuals in the ages 35 to 39 category to account for individuals exactly age 35. For example, U.S. Census population data for 2023 estimates 11,175,898 males ages 25 to 29, 11,883,289 males ages 25 to 29, and 11,364,080 males ages 30 to 34. Based on this, my estimate of the U.S. population ages 25 to 35 is calculated as follows: 11,175,898 (ages 25 to 29) + 11,883,289 (ages 30 to 34) + [11,364,080 x .20 (age 35 estimated)] = 25,332,003.

[9] For illustrations of these methods, see: https://www.qualtrics.com/blog/calculating-sample-size/ and https://sawtoothsoftware.com/resources/sample-size-calculator

[10] https://www.cloudresearch.com/products/connect-for-researchers/

[11] Hartman, R., Moss, A. J., Jaffe, S. N., Rosenzweig, C., Litman, L., & Robinson, J. (2023), *Introducing Connect by CloudResearch: Advancing Online Participant Recruitment in the Digital Age*, https://doi.org/10.31234/osf.io/ksgyr.

demonstrated increased levels of attention, effort, and engagement compared to other popular online panel platforms.[12]

17.     Invitations to complete the study via the CloudResearch Connect platform was restricted to males between the ages of 25 and 35 residing in the United States. As discussed previously, these criteria were chosen to ensure that the sample was drawn from a relevant population of potential customers for both Mr. Hormozi and Hostage Nose Strips. Additionally, the study could only be completed using a desktop or laptop computer to ensure sufficient screen size to display the images in the survey. The study was described as a consumer study taking approximately 10 minutes with compensation of $4.00 offered for completion.

*Respondents*

18.     In line with the desired sample size, a total of 1,001 male U.S. residents between ages 25 and 35 responded to the survey. Looking at respondent characteristics such as age, education, household income, and marital status, the sample appears to be well-distributed across various demographic characteristics such as age, education, income, and marital status (see Appendix 3). Preliminary supplementary analyses suggest that results within these subgroups (e.g., comparing survey results for respondents holding a Bachelor's degree or higher versus less than a Bachelor's degree) are generally consistent with the results for the full sample.[13] Thus, I am confident to a reasonable degree that the survey results for the full sample are sufficiently representative of males ages 25 to 35 living in the United States and likely so for a variety of

---

[12] Douglas, B. D., Ewell, P. J., & Brauer, M. (2023), "Data Quality in Online Human-Subjects Research: Comparisons Between MTurk, Prolific, CloudResearch, Qualtrics, and SONA," *PLOS ONE*, *18*(3), e0279720. https://doi.org/10.1371/journal.pone.0279720
[13] Further details of the supplementary analyses will be provided in a subsequent version of this report.

Preliminary Expert Report of Jesse Catlin, Ph.D.                                          12

subgroups within this population that might be targeted by Mr. Hormozi and Hostage Nose Strips.

**Survey Procedure and Questionnaire**

19.     On the first page of the survey, respondents viewed initial instructions that provided information about the purpose of the survey. This included emphasizing that there are no "right" or "wrong" answers and that respondents should answer honestly based on their own opinions (see full survey questionnaire in Appendix 2). Next, respondents were shown a page that featured an image of the Hostage Nose Strips packaging (displayed at a size of approximately 4.5" H x 3" W, as shown in Figure 5). This page also contained text introducing the product and its purpose. Respondents were informed that, in subsequent pages, they would be shown the package in addition to pictures of a person and questions related to their perception of whether there could be an affiliation, endorsement, or business association between the person and Hostage Nose Strips.

*Figure 5 – Hostage Nose Strips Packaging*



Note: Hostage Nose Strip packaging displayed at www.hostagetape.com as of May 4, 2024.

*Sequential Lineup Questions*

20.     On the next pages, respondents were shown the side-by-side images (one side-by-side image per page, with page display order randomly determined for each respondent; displayed at a size of approximately 3.5" H x 5.5" W; see Figures 1-4 and Appendix 3) and asked to answer the following question for each image: "Based on the product packaging shown here, do you believe the person shown is affiliated with, endorsing, or has a business association with Hostage Nose Strips?" (Answer choices: Yes/No/I'm not sure). After answering this question,

respondents were shown a follow-up, open-ended question prompting them to explain their answer (i.e., why they answered yes, no, or not sure).

*Simultaneous Lineup Questions*

21. In the next part of the survey, respondents were shown each of the side-by-side images on a single page (the display order of the images on the page was randomly determined for each respondent; see Figures 1-4 and Appendix 3). For each side-by-side, respondents were asked to answer the following: "Based on the product packaging shown here, how likely do you think it is that the person shown is affiliated with, endorsing, or has a business association with Hostage Nose Strips?" (Scale choices: 1 - Extremely unlikely / 2 - Moderately unlikely / 3 - Slightly unlikely / 4 - Neither likely nor unlikely / 5 - Slightly likely / 6 - Moderately likely / 7 - Extremely likely).

22. Lastly, respondents were asked to answer questions about themselves, including questions about whether they'd previously heard of and used nose/nasal strips prior to the survey. A total of 680 (67.9%) respondents reported having heard of nose/nasal strips and 237 (23.7%) reported previous nose/nasal strip use.

## IV. Survey Results

**Sequential Lineup Results**

When shown each side-by-side image sequentially and asked if they believed the person shown is affiliated with, endorsing, or has a business association with Hostage Nose Strips, nearly half of respondents (49.1%; n = 491) answered "Yes" for Alex Hormozi. Chi-square tests were

performed to assess whether the pattern of responses (i.e., number of "Yes", "No", and "I'm not sure" responses) for the side-by-side featuring Mr. Hormozi were significantly different from each of the control side-by-sides (see statistical comparison results following Table 1). The pattern of results for Mr. Hormozi exhibited significantly higher frequency of a perceived association (i.e., more "Yes" responses) relative to each of the controls. More specifically, 49.1% (n = 491) of respondents answered "Yes" regarding their perception of an association between Mr. Hormozi and Hostage Nose Strips compared to 38.7% (n = 387), 25.7% (n = 257), and 29.7% (n = 297) for Controls 1, 2, and 3, respectively.

### *Table 1 – Sequential Lineup Response Summary*

| Side-By-Side Image | Based on the product packaging shown here, do you believe the person shown is affiliated with, endorsing, or has a business association with Hostage Nose Strips? | | |
|---|---|---|---|
| | Yes | No | I'm not sure |
| Alex Hormozi | 49.1% [46.0%, 52.1%] 491 [460, 522] | 29.9% [27.1%, 32.8%] 299 [271, 328] | 21.1% [18.6%, 23.7%] 211 [187, 237] |
| Control 1[a] | 38.7% [35.7%, 41.7%] 387 [357, 417] | 38.4% [35.4%, 41.4%] 384 [354, 414] | 23.0% [20.5%, 25.7%] 230 [205, 257] |
| Control 2[b] | 25.7% [23.0%, 28.4%] 257 [231, 285] | 52.2% [49.2%, 55.3%] 523 [492, 554] | 22.1% [19.6%, 24.7%] 221 [196, 248] |
| Control 3[c] | 29.7% [26.9%, 32.6%] 297 [269, 326] | 48.0% [44.9%, 51.0%] 480 [449, 511] | 22.4% [19.9%, 25.0%] 224 [199, 251] |

Notes: Cells contain % of responses and frequencies (n) with corresponding lower and upper 95% confidence intervals shown in brackets below. Percentages may not add to 100 due to rounding.

**Statistical comparisons (Chi-square tests):**

[a]Alex Hormozi vs. Control 1: Chi-square = 23.72, $p < .001$

[b]Alex Hormozi vs. Control 2: Chi-square = 134.48, $p < .001$

[c]Alex Hormozi vs. Control 3: Chi-square = 90.21, $p < .001$

23.     These results suggest that a substantial number of participants (nearly half) erroneously perceived an association between Alex Hormozi and Hostage Nose Strips based on the product packaging. Further, the significantly higher frequency of the perceived association between

Hostage Nose Strips and Mr. Hormozi relative to all three of the control images implies that the degree of this confusion is driven by more than just general feature similarities. Instead, there appear to be specific aspects or Mr. Hormozi's appearance that respondents perceived to be reflected in the Hostage Nose Strip packaging and they go beyond simply having long hair and thick facial hair.

*Open-Ended Responses*

24.     After answering whether they believed whether the person shown in a side-by-side image was affiliated with, endorsing, or has a business association with Hostage Nose Strips, participants were then prompted to explain their answer in an open-ended text box (i.e., why they answered yes, no, or not sure) (see questionnaire in Appendix 2). The analysis of these responses is ongoing and includes detailed coding and assessment of the reasons provided for each answer. These results will be discussed in detail in a subsequent version of this report. However, preliminary results indicate that reasons for responding "Yes" about an association between Alex Hormozi and Hostage Nose Strips were based on strong perceptions of similarity between the facial features of Mr. Hormozi (e.g., his facial hair/beard style) and that of the model used on the Hostage Nose Strips packaging. Those who answered "No" or "I'm not sure" about an association also often note a high degree of similarity in appearance between Mr. Hormozi and the model used for the packaging. However, many of these respondents stated that they answered "No" or "I'm not sure" about an association because the survey did not explicitly state or show a connection, such as Mr. Hormozi wearing a nose strip in the image or other information confirming a direct association between Mr. Hormozi and Hostage Nose Strips. Thus, these preliminary results suggest widespread recognition of the high degree of similarity between Mr.

Hormozi's likeness and the image used on the product packaging. In addition, as noted previously, Mr. Hormozi can often be seen wearing nose strips and frequently discusses them in the content he creates (social media posts, podcasts, etc.). As a result, there appears to be notable potential for confusion even among those who answered "No" or "I'm not sure" about an association if they were to encounter the large volume of easily accessible marketplace content that shows Mr. Hormozi wearing and/or discussing nose strips.

**Simultaneous Lineup Results**

25.    When shown all four of the side-by-side images simultaneously on a page and asked to indicate on a seven-point scale how likely they thought it was that the person shown is affiliated with, endorsing, or has a business association with Hostage Nose Strips, the mean rating was highest for Alex Hormozi (mean rating = 4.92 on a 1 to 7 scale, with 4 as a neutral midpoint and values above 4 indicating perceptions that an association is likely and values below 4 indicating perceptions that an association is unlikely). Comparisons of the ratings of the likelihood of association made by each individual respondent (via one-sample t-tests) showed that, on average, respondents tended to rate the likelihood of Alex Hormozi's association with Hostage Nose Strips (mean = 4.92) higher than any of the controls (means of 4.18, 3.38, and 3.75; see Table 2 for details).

### *Table 2 – Simultaneous Lineup Likelihood Scale Means and Standard Deviations*

| Side-By-Side Image | Based on the product packaging shown here, how likely do you think it is that the person shown is affiliated with, endorsing, or has a business association with Hostage Nose Strips? | |
| --- | --- | --- |
| | Mean | Standard Deviation |
| Alex Hormozi | 4.92 | 1.88 |
| Control 1[a] | 4.18 | 1.80 |
| Control 2[b] | 3.38 | 1.79 |
| Control 3[c] | 3.75 | 1.81 |

**Statistical comparisons (paired t-tests):**

[a]Alex Hormozi vs. Control 1: t(1000) = 10.67, *p* < .001

[b]Alex Hormozi vs. Control 2: t(1000) = 20.05, *p* < .001

[c]Alex Hormozi vs. Control 3: t(1000) = 15.37, *p* < .001

26.     Further, looking at the individual scale responses, 264 respondents selected "7 – Extremely likely" for Alex Hormozi's likelihood of association, compared to 80, 28, and 56 respondents choosing this option for the controls. Such a result is again highly suggestive of a substantially greater perceived likelihood of an association between Mr. Hormozi and Hostage Nose Strips as compared to the controls. Moreover, 476 out of 1,001 respondents (47.6%) rated Mr. Hormozi's likelihood of association as "moderately likely" (n = 212) or "extremely likely" (n = 264), which far exceeds any of the controls. For Control 1, only 291 (29.1%) indicated the likelihood of association as "moderately likely" or "extremely likely", followed by Control 3 at 212 (21.2%) and Control 3 at 152 (15.2%) rating the likelihood as "moderately likely" or "extremely likely" (see Table 3 for a detailed breakdown of scale responses).

### *Table 3 – Simultaneous Lineup Rating Frequencies*

| Side-By-Side Image | Based on the product packaging shown here, how likely do you think it is that the person shown is affiliated with, endorsing, or has a business association with Hostage Nose Strips? | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1 – Extremely unlikely | 2 – Moderately unlikely | 3 – Slightly unlikely | 4 – Neither likely nor unlikely | 5 – Slightly likely | 6 – Moderately likely | 7 – Extremely likely |
| Alex Hormozi | 58 | 105 | 69 | 134 | 159 | 212 | 264 |
| Control 1 | 90 | 152 | 106 | 161 | 201 | 211 | 80 |
| Control 2 | 191 | 209 | 128 | 155 | 166 | 124 | 28 |
| Control 3 | 115 | 218 | 123 | 155 | 178 | 156 | 56 |

Note: Cells indicate frequencies of scale responses.

27.     In addition, an analysis of the ratings for each side-by-side relative to the neutral midpoint of the scale (4 – Neither likely nor unlikely), shows that the mean likelihood of association rating for Mr. Hormozi (4.92) was significantly above the midpoint of the scale (4.00) (see results for one-sample t-tests below). This indicates an overall tendency toward respondents believing that there was some type of association between Mr. Hormozi and Hostage Nose Strips. The mean rating for Control 1 was also above the midpoint, however, the mean rating (4.18) and size of the difference was considerably lower than for Mr. Hormozi. For Control 2 (3.38) and Control 3 (3.75), the ratings were significantly below the neutral midpoint of the scale (4.00), suggesting an overall tendency toward a belief that there was not an association between these controls and Hostage Nose Strips.

**Statistical tests (one-sample t-tests):**

Alex Hormozi vs. midpoint: $t(1000) = 15.48$, $p < .001$

Control 1 vs. midpoint: $t(1000) = 3.21$, $p = .001$

Control 2 vs. midpoint: $t(1000) = -10.95$, $p < .001$

Control 3 vs. midpoint: $t(1000) = -4.30$, $p < .001$

28.     Combined, this suggests that participants generally perceived an association between Alex Hormozi and Hostage Nose Strips and the perceived likelihood of association is stronger for Mr. Hormozi compared to all three of the controls. Again, these results reflect a notable perception of an association between Mr. Hormozi and Hostage Nose Strips and this perception is driven, at least in part, by more nuanced characteristics of Mr. Hormozi's likeness as demonstrated by the comparisons to the controls.

## V. Summary and Conclusion

29.     Mr. Hormozi and Hostage Nose Tape both target male consumers ages 25 to 35 living in the United States. This overlap in target market and similar focus on digital marketing establishes ample likelihood that consumers meeting this target criteria could encounter marketing content from both entities through natural marketplace conditions and with sufficient frequency. Consequently, it is my view that marketplace conditions present the potential for consumer confusion to occur.

30.     To assess the likelihood of consumer confusion, I conducted a survey of 1,001 male consumers ages 25 to 35 residing in the United States. The survey took the form of a lineup

study and featured four separate side-by-side images of Hostage Tape Nose strips packaging along with an image of a person (see Figures 1, 2, 3, and 4). One of these side-by-side images contained a picture of Alex Hormozi and the remaining three contained stock images of males with long hair and thick facial hair as controls. The primary focus of the survey was responses to questions about whether there was a perceived association between each individual pictured and Hostage Nose Strips.

31.     The results of the survey clearly suggest high levels of consumer confusion among respondents. When shown images of Alex Hormozi and Hostage Nose Strips packaging, nearly half (49.1%; n = 491 out of 1,001) answered "Yes" in response to a question regarding whether they believed the person shown was affiliated with, endorsing, or has a business association with Hostage Nose Strips. Critically, the frequency of this perceived association was statistically significantly higher for Mr. Hormozi than for each of three separate control images of individuals who fit a similar general description. As such, I believe that the data demonstrate a resemblance between Mr. Hormozi's likeness and the Hostage Nose Strips packaging that goes beyond broad similarities in appearance (e.g., simply having thick facial hair) and instead appears based on more nuanced features that set Mr. Hormozi apart from the others.

32.     Preliminary results from the ongoing analysis of open-ended reasons explaining why respondents chose "Yes", "No", or "I'm not sure" regarding their belief about an association between Mr. Hormozi and Hostage Nose Strips suggest that "Yes" answers were driven heavily by perceptions of similarity in appearance between Mr. Hormozi's likeness and the image on the product packaging. Further, preliminary results for those who did not choose "Yes," often noted

the high degree of similarity in appearance between Mr. Hormozi and the image on the

packaging, but explained that their "No" or "I'm not sure" answer was driven by the lack of

information demonstrating an explicit connection to the product, such as the fact that Mr.

Hormozi was not wearing a nose strip in the image. While the survey was intentionally and

conservatively designed not to feature Mr. Hormozi wearing a nose strip, explanations like these

would suggest that numerous respondents who did not indicate an affirmative belief about an

association in the survey would be vulnerable to confusion if exposed to widely accessible

marketplace content and images of Mr. Hormozi wearing and/or discussing nose strips.


33.     When shown all four side-by-side images on the same page, participants also rated the

likelihood of an association with Hostage Nose Strips as significantly more likely for Mr.

Hormozi compared to all three of the control images. On a seven-point scale, 264 respondents

rated the likelihood of an association between Mr. Hormozi and Hostage Nose Strips as "7 –

Extremely likely". In contrast, for Controls 1, 2, and 3, this option was only chosen 80, 28, and

56 times, which reinforces the much higher perceived likelihood of association for Mr. Hormozi.

Indeed, 47.6% of respondents indicated that an affiliation between Hostage Nose Strips and Mr.

Hormozi was "moderately likely" or "extremely likely". This level of perceived likelihood of an

association with Mr. Hormozi was well beyond the controls, with only 29.1%, 15.2%, and 21.2%

of respondents rating each of the respective controls as "moderately likely" or "extremely likely"

to have an association with Hostage Nose Tape.


34.     Additionally, the mean rating of the likelihood of an association for Mr. Hormozi was

significantly higher than the neutral midpoint of the scale which implies a general tendency to

perceive Mr. Hormozi as being likely to have an association with Hostage Nose Strips. The magnitude of this difference exceeds that of the controls, which again is suggestive that the perceived association for Mr. Hormozi and Hostage Nose Strips is derived from more than a random coincidence of general appearance characteristics.

35.    Based on the totality of the data, it is my opinion that there is clear and convincing evidence of consumer confusion such that, based on the product packaging, consumers may perceive a false endorsement of Hostage Nose Strips by Mr. Hormozi.

Dated: July 15, 2024

_____

Jesse Catlin, Ph.D.

# VI. Appendix 1 – CV of Jesse Catlin, Ph.D.

## JESSE R. CATLIN

| Academic | Consulting |
|---|---|
| College of Business | Catlin Research + Consulting |
| California State University, Sacramento | www.catlinrc.com |
| jesse.catlin@csus.edu | jesse@catlinrc.com |

## EDUCATION

Ph.D., Management (emphasis in Marketing)
*University of California, Irvine*                                           2012

M.A., Economics
*California State University, Sacramento*                                    2007

B.A., Economics (minor in Business Administration)
*California State University, Sacramento*                                    2005

## ACADEMIC POSITIONS

Chair, Department of Marketing & Supply Chain Management      Sept. 2023 – Present
Professor of Marketing                                       Aug. 2022 – Present
Chair (Interim), Department of Marketing & Supply Chain Management   May 2020 – Jan. 2021
Associate Professor of Marketing                            Aug. 2018 – Aug. 2022
Assistant Professor of Marketing                            Aug. 2014 – Aug. 2018
*College of Business, California State University, Sacramento*

Assistant Professor of Marketing                            Aug. 2012 – Aug. 2014
*College of Business, Washington State University Tri-Cities*

## CONSULTING EXPERIENCE

Consultant with broad expertise in the areas of marketing and consumer behavior.
Representative engagements include:

*Expert Reports and Testimony*
- Designing, fielding, and analyzing consumer surveys for various purposes
- Rebuttal expert report in case involving analysis of customer database and valuation of marketing activities

*Regulatory and Policy*
- Special consultant to the Food and Drug Administration (FDA)
- Service on the Nonprescription Drugs Advisory Committee (NDAC) evaluating an application to switch a drug from prescription-to-nonprescription status

*Marketing Research and Strategy*
- Created brand identity for automotive quick lube chain
- Site selection models and market feasibility for automotive maintenance franchise

## RESEARCH INTERESTS

Consumer misconceptions and beliefs; pharmaceutical labeling and regulation; health communication; sustainable consumption

## JOURNAL PUBLICATIONS

Lteif, Lama, Gia Nardini, Tracy Rank-Christman, Lauren Block, Melissa G. Bublitz, Jesse R. Catlin, Samantha N. N. Cross, Anne Hamby, and Laura A. Peraccio, (2024), "Climate Action Now: How to Fuel a Social Movement," *Journal of Consumer Psychology*, 34(1), 119-139.

Bublitz, Melissa G., Jesse R. Catlin, Aziza C. Jones, Lama Lteif, and Laura A. Peraccio, (2023), "Plant Power: SEEDing Our Future with Plant-Based Eating," *Journal of Consumer Psychology*, 33(1), 167-196.

Benoit, Ilgim D., Elizabeth G. Miller, Ann M. Mirabito, and Jesse R. Catlin, (2022), "Medical Decision-Making with Tables and Graphs: The Role of Cognition, Emotions, and Analytic Thinking," *Health Marketing Quarterly*, 40(1), 59-81.

LaBarge, Monica C., Kristen L. Walker, Courtney Nations Azzari, Maureen Bourassa, Jesse Catlin, Stacey Finkelstein, Alexei Gloukhovtsev, James Leonhardt, Kelly Martin, Maria Rejowicz-Quaid, and Mehrnoosh Reshadi, (2022), "Digital Exchange Compromises: Teetering Priorities of Consumers and Organizations at the Iron Triangle," *Journal of Consumer Affairs*, 56(3), 1220-1243.

Catlin, Jesse R., James M. Leonhardt, Yitong Wang, and Rommel J. Manuel, (2021), "Landfill or Recycle? Pro-Environmental Receptacle Labeling Increases Recycling Contamination," *Journal of Consumer Psychology*, 31(4), 765-772.

Lyon, Elizabeth, and Jesse R. Catlin, (2020), "Consumer Misconceptions about Tax Laws: Results from a Survey in the United States," *Journal of Consumer Policy*, 43(4), 807-828.

Pechmann, Cornelia (Connie), Jesse R. Catlin, and Yu Zheng, (2020), "Facilitating Adolescent Well-Being: A Review of the Challenges and Opportunities and the Beneficial Roles of Parents, Schools, Neighborhoods and Policymakers," *Journal of Consumer Psychology*, 30(1), 149-177.

Catlin, Jesse R. and Eric P. Brass (2018), "The Effectiveness of Nonprescription Drug Labels in the United States: Insights from Recent Research and Opportunities for the Future," *Pharmacy*, 6(4), 119.

Catlin, Jesse R., Michael Gerhard Luchs, and Marcus Phipps (2017), "Consumer Perceptions of the Social Vs. Environmental Dimensions of Sustainability," *Journal of Consumer Policy*, 40(3), 245-277.

Catlin, Jesse R. and Cornelia (Connie) Pechmann (2016), "An Investigation of Consumer and Doctor Regulatory Beliefs and Regulatory Knowledge about Pharmaceutical Drug Promotions," *Journal of the Association for Consumer Research*, 1(3), 392–410.

Ozanne, Lucie, Marcus Phipps, Todd Weaver, Michal Carrington, Michael Luchs, Jesse R. Catlin, Shipra Gupta, Nicholas Santos, Kristin Scott, and Jerome Williams (2016), "Managing the Tensions at the Intersection of the Triple Bottom Line: A Paradox Theory Approach to Sustainability Management," *Journal of Public Policy & Marketing*, 35(2), 249-261.

Pechmann, Cornelia and Jesse R. Catlin (2016), "The Effects of Advertising and Other Marketing Communications on Health-related Consumer Behaviors," *Current Opinion in Psychology*, 10, 44-49.

Catlin, Jesse R., Cornelia (Connie) Pechmann, and Eric P. Brass (2015), "Dangerous Double Dosing: How Naive Beliefs Can Contribute to Unintentional Overdose with Over-the-Counter Drugs," *Journal of Public Policy & Marketing*, 34(2), 194-209.
    ***Distinguished Winner of the 2020 AMA-EBSCO Award for Responsible Research in Marketing***

Leonhardt, James M., Jesse R. Catlin, and Dante M. Pirouz (2015), "Is Your Product Facing the Ad's Center? Facing Direction Affects Processing Fluency and Ad Evaluation," *Journal of Advertising*, 44(4), 315-325.

Catlin, Jesse R. and Yitong Wang (2013), "Recycling Gone Bad: When the Option to Recycle Increases Resource Consumption," *Journal of Consumer Psychology*, 23(1), 122-127.
    ***Received the 2014 Park Young Contributor Award***

Phipps, Marcus, Lucie K. Ozanne, Michael G. Luchs, Saroja Subrahmanyan, Sommer Kapitan, Jesse R. Catlin, Roland Gau, Rebecca Walker Naylor, Randall L. Rose, Bonnie Simpson,

and Todd Weaver (2013), "Understanding the Inherent Complexity of Sustainable Consumption: A Social Cognitive Framework," *Journal of Business Research*, 66(8), 1227-1234.

Catlin, Jesse R., Cornelia (Connie) Pechmann, and Eric P. Brass (2012), "The Influence of Need for Cognition and Principle Display Panel Factors on Over-the-Counter Drug Facts Label Comprehension," *Health Communication*, 27(3), 264-272.

Luchs, Michael G., Rebecca Walker Naylor, Randall L. Rose, Jesse R. Catlin, Roland Gau, Sommer Kapitan, Jenny Mish, Lucie Ozanne, Marcus Phipps, Bonnie Simpson, Saroja Subrahmanyan, and Todd Weaver (2011), "Toward a Sustainable Marketplace: Expanding Options and Benefits for Consumers," *Journal of Research for Consumers*, 19, 1-12.

Scammon, Debra L., Punam Anand Keller, Pia A. Albinsson, Shalini Bahl, Jesse R. Catlin, Kelly L. Haws, Jeremy Kees, Tracey King, Elizabeth Gelfand Miller, Ann M. Mirabito, Paula C. Peter, and Robert M. Schindler (2011), "Transforming Consumer Health," *Journal of Public Policy & Marketing*, 30(1), 14-22.

Gallet, Craig. A. and Jesse R. Catlin (2009), "The Determinants of Tobacco Control in Europe: A Research Note," *The Social Science Journal*, 46(1), 143-149.

**OTHER PUBLICATIONS**

Mirabito, Ann M., Jesse R. Catlin, and Elizabeth Gelfand Miller (2013), "Show Me the Number: Communicating Probabilities and Tradeoffs in Real Estate Transactions, *Keller Center Research Report*, 6(3), 8-14.

**MEDIA PARTICIPATION AND COVERAGE**

Coverage of research and/or commentary includes outlets such as: *CNN, Marketplace, Men's Health, Prevention, Psychology Today, Capital Public Radio, Sacramento Bee, Sacramento Business Journal, KFBK NewsRadio, KCBS Radio, Salon, Huffington Post, Yahoo News, Yahoo Health, Reuters, The Consumerist, Glamour, Attn:, MSN, and Sacramento Magazine.*

**INVITED PRESENTATIONS AND CONFERENCE PROCEEDINGS (* denotes presenter)**

Catlin, Jesse R.* (2021), "Drug Facts Label Communication: Successes and Challenges," Invited Presentation, *The Nonprescription Drug Facts Label in a Changing Consumer Marketplace 2021*, workshop hosted by the U.S. Food and Drug Administration.

Catlin, Jesse R.* (2020), "Dangerous Double Dosing: How Naive Beliefs Can Contribute to Unintentional Overdose with Over-the-Counter Drugs," AMA-EBSCO Awards Session, Invited Presentation, *American Marketing Association Summer Educator's Conference.*

Catlin, Jesse R.* (2019), "Beyond the Drug Facts Label: Leveraging Consumer Trends to Enhance OTC Drug Communications," Invited Presentation, *Regulatory & Scientific Affairs Committee of the Consumer Healthcare Products Association.*

Catlin, Jesse R.* (2019), "Looking Back to Look Ahead: Technology's Role in Self-Care," Invited Panelist, *Consumer Healthcare Products Association Regulatory, Scientific, & Quality Conference.*

Lyon, Elizabeth and Jesse R. Catlin (2019), "Consumers Lack Knowledge about Common Tax Concepts: Results from a Survey," Poster, *Marketing and Public Policy Conference.*

Catlin, Jesse R., Yitong Wang, and Rommel J. Manuel (2018), "Pro-Environmental Waste Receptacle Labeling Can Increase Recycling Contamination," Abstract, *Behavioral Decision Research in Management Conference.*

Catlin, Jesse R.*, Yitong Wang, and Rommel J. Manuel (2017), "Wishful Recycling": How Pro-Environmental Receptacle Labeling Can Increase Recycling Contamination," Abstract, *Marketing and Public Policy Conference.*

Catlin, Jesse R.*, Yitong Wang, and Rommel J. Manuel (2017), "'Wishful Recycling': Exploring the Effects of Receptacle Signage on Consumer Disposal," Abstract, *Society for Consumer Psychology Conference.*

Catlin, Jesse R.*, Cornelia (Connie) Pechmann, and Eric P. Brass (2015), "Dangers of the 'Double Dip': How Naive Beliefs Can Contribute to Accidental Overdose on Over-the-Counter Drugs," Abstract, *Marketing and Public Policy Conference.*

Dara, Ilgim, Elizabeth Gelfand Miller, Ann Mirabito, and Jesse R. Catlin (2015), "Developing a Model of the Effect of Display Format on Patients' Health Decisions," Abstract, *Marketing and Public Policy Conference.*

Catlin, Jesse R., Michael G. Luchs, and Marcus Phipps (2014), "The Better of Two 'Goods': Choice Given a Trade-Off Between Pro-Social and Pro-Environmental Performance," Abstract, Association for Consumer Research Conference.

Catlin, Jesse R.*, Michael G. Luchs, and Marcus Phipps (2014), "Deconstructing Sustainability: The Different Effects of Pro-Environmental and Pro-Social Attributes on Consumer Behavior," Abstract, *American Marketing Association Winter Educators' Conference.*

Catlin, Jesse R., Elizabeth Gelfand Miller, and Ann M. Mirabito (2013), "The Effect of Health Risk Presentation Format on Consumer Perceptions and Choice," Abstract, *Marketing and Public Policy Conference.*

Catlin, Jesse R.* and Yitong Wang (2012), "Recycling Gone Bad: When the Option to Recycle Increases Resource Consumption," Abstract, *Marketing and Public Policy Conference.*

Catlin, Jesse R.* and Elizabeth Gelfand Miller (2011), "When the Doctor Speaks: How the Source of Information Impacts Consumers' Perceptions of Side Effect Information," Abstract, *Society for Consumer Psychology Conference.*

Leonhardt, James M., Dante M. Pirouz, and Jesse R. Catlin (2011), "Lateral Orientation Affects Preference, Perceived Usability and Purchase Intent," Abstract, *Society for Consumer Psychology Conference.*

Lau-Gesk, Loraine, Joan Meyers-Levy, and Jesse R. Catlin* (2010), "Differentiating Between Simple and Complex Emotions: It's a Matter of Abstractness," Special Session Summary, Association for Consumer Research Conference.

## TEACHING EXPERIENCE

College of Business, *California State University, Sacramento*
  *Graduate Courses:* Strategic Marketing Management; Marketing Management
  *Undergraduate Courses:* Principles of Marketing; Buyer Behavior

Graduate School of Management, *University of California, Davis*
  *Graduate Courses:* Pricing, Marketing Strategy, Marketing Management, Consumer Behavior

College of Business, *Washington State University Tri-Cities*
  *Graduate Course:* Marketing Strategy
  *Undergraduate Courses:* Marketing (Introductory Course); Marketing Management

The Paul Merage School of Business, *University of California, Irvine*
  *Undergraduate Course:* Retailing

College of Business Administration, *California State University, Long Beach*
  *Undergraduate Course:* Retail Concepts and Policies

## AWARDS, HONORS, AND FELLOWSHIPS

| | |
|---|---:|
| AMA-EBSCO Award for Responsible Research in Marketing | 2020 |
| Outstanding Scholarly & Creative Activity Award, *College of Business* | 2019-2020 |

| | |
|---|---|
| Outstanding Teaching Award, *College of Business* | 2018-2019 |
| DEGREES Project Innovator Award, *California State University, Sacramento* | 2018 |
| Park Young Contributor Award, *Journal of Consumer Psychology* | 2014 |
| Provost's Research Incentive Funding, *California State University, Sacramento* | 2014 |
| Association for Consumer Research (ACR) Transformative Consumer Research Grant | 2013 |
| WSU College of Business Faculty Summer Research Grant | 2013 |
| UC Irvine Public Impact Distinguished Fellowship | 2012 |
| Newkirk Center for Science & Society Fellowship | 2010 |
| Ray Watson Endowed Fellowship | 2010 |
| UC Irvine Regents' Fellowship | 2007 |

## SERVICE

Ad Hoc Reviewing

*Journal of Marketing Research; Journal of Consumer Research; Journal of Consumer Psychology; Journal of Public Policy & Marketing; Journal of Advertising; Journal of the Association for Consumer Research; Journal of Business Ethics; Journal of Business Research; Journal of Consumer Affairs; European Journal of Marketing; International Journal of Research in Marketing; Journal of Cleaner Production; PLOS ONE; Journal of General Internal Medicine; British Journal of Clinical Pharmacology; Appetite; Young Consumers; Health Psychology Open; Environment and Behavior; Journal of Environmental Psychology; Marketing Science Institute (MSI)*

Conference Reviewing

Marketing and Public Policy Conference; Association for Consumer Research Conference; Society for Consumer Psychology Conference; American Marketing Association Summer and Winter Conferences

Student Advising and Outreach

Faculty Advisor for the Dedicated to Educating, Graduating, and Retaining Educational Equity Students (DEGREES) Project; Marketing Department Faculty Advisor (Graduate and Undergraduate)

University Committee Service (*California State University, Sacramento*)

Academic Policies Committee; Faculty Senate Representative; Program Review Committee; Sustainability Steering Committee; Student Health Advisory Committee; Student Response System Task Force

College of Business Committee Service (*California State University, Sacramento*)

Primary ARTP Review Committee (chair and member); Secondary ARTP Review Committee; External Programs Committee; Dean Search Committee; Associate Dean for Academic Programs Search Committee (chair); ARTP Policy Committee; Faculty Qualifications Committee; Elections Committee

Committees (*External*)

      Transformative Consumer Research Advisory Committee

## PROFESSIONAL ASSOCIATIONS

American Marketing Association (AMA); Association for Consumer Research (ACR); Society for Consumer Psychology (SCP)

## VII. Appendix 2 – Respondent Characteristics

**Respondent Age**

| Age | Frequency | % of Sample |
|-----|-----------|-------------|
| 25 | 63 | 6.3% |
| 26 | 78 | 7.8% |
| 27 | 73 | 7.3% |
| 28 | 77 | 7.7% |
| 29 | 92 | 9.2% |
| 30 | 107 | 10.7% |
| 31 | 101 | 10.1% |
| 32 | 113 | 11.3% |
| 33 | 106 | 10.6% |
| 34 | 90 | 9.0% |
| 35 | 101 | 10.1% |

Note: Total of 1,001 respondents. Percentages may not add to 100 due to rounding.

**Respondent Education**

| Education Level | Frequency | % of Sample |
|-----------------|-----------|-------------|
| Less than high school diploma | 5 | 0.5% |
| High school graduate (or equivalent) | 127 | 12.7% |
| Some college, but no degree | 168 | 16.8% |
| Associate degree | 85 | 8.5% |
| Bachelor's degree (BA, BS, etc.) | 453 | 45.3% |
| Master's degree (MA, MS, etc.) | 130 | 13.0% |
| Professional degree (JD, MD, etc.) | 15 | 1.5% |
| Doctorate (PhD, EdD, etc.) | 15 | 1.5% |
| Other/Prefer not to say | 3 | 0.3% |

Note: Total of 1,001 respondents. Percentages may not add to 100 due to rounding.

**Respondent Annual Household Income**

| Income Level | Frequency | % of Sample |
|--------------|-----------|-------------|
| Less than $10,000 | 55 | 5.5% |
| $10,000 to $19,999 | 30 | 3.0% |
| $20,000 to $29,999 | 58 | 5.8% |
| $30,000 to $39,999 | 70 | 7.0% |
| $40,000 to $49,999 | 90 | 9.0% |
| $50,000 to $59,999 | 102 | 10.2% |
| $60,000 to $69,999 | 81 | 8.1% |
| $70,000 to $79,999 | 97 | 9.7% |
| $80,000 to $89,999 | 54 | 5.4% |
| $90,000 to $99,999 | 50 | 5.0% |
| $100,000 to $124,999 | 110 | 11.0% |
| $125,000 to $149,999 | 61 | 6.1% |
| $150,000 to $174,999 | 39 | 3.9% |

| $175,000 to $199,999 | 22 | 2.2% |
|---|---|---|
| $200,000 to $224,999 | 25 | 2.5% |
| $225,000 to $249,999 | 9 | 0.9% |
| $250,000 or more | 21 | 2.1% |
| Prefer not to say | 27 | 2.7% |

Note: Total of 1,001 respondents. Percentages may not add to 100 due to rounding.

## VIII. Appendix 3 – Survey Questionnaire

**Note: Highlighted portions provide information about page breaks, display randomization, etc. and were not shown to participants.**

### INSTRUCTIONS (PLEASE READ CAREFULLY)

Thank you for participating in this survey which is expected to take approximately 10 minutes to complete.

Your responses may be used as part of a legal case to assess whether consumers could be confused about a person's endorsement or affiliation with a particular product. Please do not consult any outside resources while completing this survey. There are no right or wrong answers - we simply want your honest opinions and reactions.

Your participation is completely voluntary and anonymous. No identifying information will be collected. If you would like to continue, please advance the page by clicking the button below.

Shown below is the packaging for a product called Hostage Nose Strips. Hostage Nose Strips are a type of adhesive strip that can be worn on the nose with the intention of opening the nostrils or nasal passages to improve airflow through the nose.



On the next pages, you will see this packaging along with pictures of a person. You will be asked questions about your perception of whether there could be an affiliation, endorsement, or business association between the person shown and Hostage Nose Strips. When you are ready to begin, please advance the page by clicking the button below.

<UPCOMING BLOCKS 1, 2, 3, AND 4 DISPLAYED IN RANDOM ORDER.>

<BLOCK 1 – Alex Hormozi (Note: Part of randomized series of blocks.)>

 

Based on the product packaging shown here, do you believe the person shown is affiliated with, endorsing, or has a business association with Hostage Nose Strips?

- o   Yes
- o   No
- o   I'm not sure

<page break>

<If "Yes" is chosen, the following open-ended question is displayed.>
What gives you the impression that the person shown IS affiliated with, endorsing, or has a business association with Hostage Nose Strips? Please explain in the space provided below.

<If "No" is chosen, the following open-ended question is displayed.>
What gives you the impression that the person shown IS NOT affiliated with, endorsing, or has a business association with Hostage Nose Strips? Please explain in the space provided below.

<If "I'm not sure" is chosen, the following open-ended question is displayed.>
What made you not sure about whether the person shown is affiliated with, endorsing, or has a business association with Hostage Nose Strips? Please explain in the space provided below.

<page break>

<BLOCK 2 – Control 1 (Note: Part of randomized series of blocks.)>

 

Based on the product packaging shown here, do you believe the person shown is affiliated with, endorsing, or has a business association with Hostage Nose Strips?

- o   Yes
- o   No
- o   I'm not sure

<page break>

<If "Yes" is chosen, the following open-ended question is displayed.>
What gives you the impression that the person shown IS affiliated with, endorsing, or has a business association with Hostage Nose Strips? Please explain in the space provided below.

<mark>&lt;If "No" is chosen, the following open-ended question is displayed.&gt;</mark>
What gives you the impression that the person shown IS NOT affiliated with, endorsing, or has a business association with Hostage Nose Strips? Please explain in the space provided below.

<mark>&lt;If "I'm not sure" is chosen, the following open-ended question is displayed.&gt;</mark>
What made you not sure about whether the person shown is affiliated with, endorsing, or has a business association with Hostage Nose Strips? Please explain in the space provided below.

<mark>&lt;page break&gt;</mark>

<BLOCK 3 – Control 2 (Note: Part of randomized series of blocks.)>

 

Based on the product packaging shown here, do you believe the person shown is affiliated with, endorsing, or has a business association with Hostage Nose Strips?

- o   Yes
- o   No
- o   I'm not sure

<page break>

<If "Yes" is chosen, the following open-ended question is displayed.>
What gives you the impression that the person shown IS affiliated with, endorsing, or has a business association with Hostage Nose Strips? Please explain in the space provided below.

<If "No" is chosen, the following open-ended question is displayed.>
What gives you the impression that the person shown IS NOT affiliated with, endorsing, or has a business association with Hostage Nose Strips? Please explain in the space provided below.

<If "I'm not sure" is chosen, the following open-ended question is displayed.>
What made you not sure about whether the person shown is affiliated with, endorsing, or has a business association with Hostage Nose Strips? Please explain in the space provided below.

<page break>

&lt;BLOCK 4 – Control 3 (Note: Part of randomized series of blocks.)&gt;

 

Based on the product packaging shown here, do you believe the person shown is affiliated with, endorsing, or has a business association with Hostage Nose Strips?

- o   Yes
- o   No
- o   I'm not sure

&lt;page break&gt;

&lt;If "Yes" is chosen, the following open-ended question is displayed.&gt;
What gives you the impression that the person shown IS affiliated with, endorsing, or has a business association with Hostage Nose Strips? Please explain in the space provided below.

<If "No" is chosen, the following open-ended question is displayed.>

What gives you the impression that the person shown IS NOT affiliated with, endorsing, or has a business association with Hostage Nose Strips? Please explain in the space provided below.

<If "I'm not sure" is chosen, the following open-ended question is displayed.>

What made you not sure about whether the person shown is affiliated with, endorsing, or has a business association with Hostage Nose Strips? Please explain in the space provided below.

<page break>

Preliminary Expert Report of Jesse Catlin, Ph.D.                                    45

<Next 4 questions shown on same page with the display order on the page randomized.>

 

Based on the product packaging shown here, how likely do you think it is that the person shown is affiliated with, endorsing, or has a business association with Hostage Nose Strips?

| 1<br>Extremely unlikely | 2<br>Moderately unlikely | 3<br>Slightly unlikely | 4<br>Neither likely nor unlikely | 5<br>Slightly likely | 6<br>Moderately likely | 7<br>Extremely likely |
|---|---|---|---|---|---|---|
| ○ | ○ | ○ | ○ | ○ | ○ | ○ |

 

Based on the product packaging shown here, how likely do you think it is that the person shown is affiliated with, endorsing, or has a business association with Hostage Nose Strips?

| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|
| Extremely unlikely | Moderately unlikely | Slightly unlikely | Neither likely nor unlikely | Slightly likely | Moderately likely | Extremely likely |
| ○ | ○ | ○ | ○ | ○ | ○ | ○ |

 

Based on the product packaging shown here, how likely do you think it is that the person shown is affiliated with, endorsing, or has a business association with Hostage Nose Strips?

| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|
| Extremely unlikely | Moderately unlikely | Slightly unlikely | Neither likely nor unlikely | Slightly likely | Moderately likely | Extremely likely |
| ○ | ○ | ○ | ○ | ○ | ○ | ○ |

 

Based on the product packaging shown here, how likely do you think it is that the person shown is affiliated with, endorsing, or has a business association with Hostage Nose Strips?

| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|
| Extremely unlikely | Moderately unlikely | Slightly unlikely | Neither likely nor unlikely | Slightly likely | Moderately likely | Extremely likely |
| ○ | ○ | ○ | ○ | ○ | ○ | ○ |

<mark>&lt;page break&gt;</mark>

Prior to this survey, have you ever heard of nose/nasal strips in general (any brand)?
- o  Yes
- o  No
- o  I'm not sure

Prior to this survey, have you ever used nose/nasal strips (any brand)?
- o  Yes
- o  No
- o  I'm not sure

<mark>&lt;End of survey&gt;</mark>

<mark>Note: Additional demographic information captured in separate questions from the survey panel platform.</mark>

EXHIBIT P27

## <u>VERIFICATION</u>

I, Dr. Jesse Catlin, declare under penalty of perjury under the laws of the United States of America that the attached Exhibit 26 is true and correct, to the best of my knowledge and belief. I further declare under penalty of perjury under the laws of the United States of America that paragraphs 79-84 of the Verified Complaint are true and correct, to the best of my knowledge and belief, except to the extent they include any allegation that originated from another person.

*Jesse Catlin*
_____
Dr. Jesse Catlin

08 / 10 / 2024
_____
Date