## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Alex Hormozi, | Civil No. 24-3241 (DWF/DTS) |
| Plaintiff, | |
| v. | **MEMORANDUM** |
| | **OPINION AND ORDER** |
| Neist Media LLC, Alex Neist and Benjamin Read, | |
| Defendants. | |

### INTRODUCTION

This matter is before the Court on Plaintiff Alex Hormozi's motion for preliminary injunction (Doc. No. 12) and Defendants Neist Media LLC ("Neist Media"), Alex Neist, and Benjamin Read's motion to dismiss Plaintiff's claim for punitive damages and motion to strike certain allegations in the complaint (Doc. No. 20). Defendants oppose Plaintiff's motion for preliminary injunction. (Doc. No. 28.) Plaintiff opposes Defendants' motion to dismiss and motion to strike. (Doc. No. 32.) For the reasons set forth below, the Court denies all three motions.

### BACKGROUND

Hormozi is an entrepreneur, online influencer, and social media personality. (Doc. No. 1 ("Compl.") ¶ 14.) He has created and sold several businesses, published two books about business, and garnered a significant social media following. (*Id.* ¶¶ 14-27.) Hormozi is well-known for business advice and "lifehacks." (*Id.* ¶¶ 28-29.) He has also advocated for benefits of wearing nose strips and often wears them in social media posts

and public talks. (*Id.* ¶¶ 32-33.) Neist Media is a Minnesota limited liability company that was formed in 2020 by Neist and Read. (*Id.* ¶¶ 38, 43.) Neist Media launched its brand "Hostage Tape" in early 2022. (*Id.* ¶ 39.) Hostage Tape sells various nose strip and mouth tape products to the public. (*Id.*)

In 2023, Hostage Tape reached out to Hormozi several times, seeking to work with him. (*Id.* ¶ 45; Doc. No. 1-1, Ex. P15.) Hostage Tape discussed Hormozi serving as "a face for distribution" and acknowledged that Hormozi had "something to sell" in his own brand. (Doc. No. 1-1, Ex. P15 at 41.) Hostage Tape and Hormozi discussed a potential deal, but ultimately could not reach an agreement on compensation. (Compl. ¶¶ 46-54, 58-60.) Over the course of their discussions, Hostage Tape created a mockup of its packaging using Hormozi's face ("Hormozi Mockup"), but Hormozi never authorized the use of this image by Hostage Tape on its packaging or social media. (*Id.* ¶¶ 55-56.)

Despite their failure to reach an agreement, Hostage Tape began promoting their brand on social media using the Hormozi Mockup. (*Id.* ¶¶ 61-62; Doc. No. 1-1, Ex. P15 at 45.) Hormozi demanded that Hostage Tape take down the image and they complied. (Compl. ¶¶ 61-62.) After taking down the Hormozi Mockup, Hostage Tape created a new image to use in its marketing and packaging (the "Image"). (*Id.* ¶ 65.) Hormozi alleges that this image is also his likeness and looks "nearly, but not 100% exactly, like [him]." (*Id.*) Subsequently, he demanded that Hostage Tape stop using the Image. (*Id.* ¶ 66.) Hostage Tape declined to stop using the Image, saying that it did not look like Hormozi and it was not "inspired" by Hormozi. (*Id.* ¶¶ 66-67; Doc. No. 1-1, Ex. P15 at 47.)

Hormozi sued Neist Media, Neist, and Read for false endorsement under the Lanham Act and the tort of appropriation under Minnesota Law on August 12, 2024. (Compl. ¶¶ 85-109.)  In his complaint, Hormozi seeks both damages and equitable relief. In support of his allegations, Hormozi commissioned a consumer survey by Jesse Catlin, a professor at California State University, Sacramento.  (*Id.* ¶¶ 79-80.)  Catlin's survey aimed "to determine whether actual confusion exists regarding Mr. Hormozi's association, affiliation, or endorsement of Hostage Tape's nose strip product based on the products packaging" by surveying 1001 males aged 25-35 years old.  (*Id.* ¶ 81.)  The survey was conducted in a lineup style, known as a *Squirt* study in the federal courts, where participants were shown Hostage Tape's packaging with the Image side-by-side with a photo of a real person.  Each time they were shown one of these side-by-sides, participants were asked whether "the person shown is affiliated with, endorsing, or has a business association with Hostage Nose Strips," as well as the likelihood of such a connection between the person shown and Hostage Tape on a scale from 1 to 7.  (Doc. No. 1-1, Ex. P26 at 122-35.)  Participants were shown four different photos alongside the Image, including a photo of Hormozi.  (*Id.*)

Catlin's results showed that 49.1 percent of participants believed that Hormozi was affiliated with Hostage Tape.  (*Id.* at 99-100.)  This was greater than the other three photos.  (*Id.* at 100.)  On the likelihood question, Catlin found a mean answer of 4.92 where "4" was "neutral" and "5" was "slightly likely."  (*Id.* at 103-104, 132.)  However, 47.6 percent of participants found that the likelihood of an association between Hormozi and Hostage Tape was "moderately likely" or "extremely likely."  (*Id.* at 104.)

Hormozi moved for a preliminary injunction to further prevent Hostage Tape from using the Image on its packaging, social media, and website. (Doc. No. 12 at 1.) Defendants moved to dismiss Hormozi's claim for punitive damages and strike paragraphs 63, 64, and 92 from the complaint, along with Exhibit P19. (Doc. No. 20.) In those paragraphs and the exhibit, Hormozi alleges that Hostage Tape infringed on various well-known intellectual property rights. (Compl. ¶¶ 63-64, 92; Doc. No. 1-1, Ex. P19.)

## DISCUSSION

## I. Plaintiff's Motion for Preliminary Injunction

The Court considers four factors in determining whether to grant a preliminary injunction: (1) the threat of irreparable harm to the moving party; (2) the balance between this harm and the injury that granting the injunction would inflict on the nonmoving party; (3) the moving party's likelihood of success on the merits; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.* However, if a court finds that the plaintiff is not likely to succeed on the merits, this "strongly suggests that preliminary injunctive relief should be denied." *CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2002). A preliminary injunction is an "extraordinary remedy," and the moving party bears the burden of establishing the need for a preliminary injunction. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

Hormozi argues that the equities weigh in his favor because he can show a "strong likelihood of success on the merits" for both claims, which creates a statutory presumption of irreparable harm under the Lanham Act. (Doc. No. 13 at 10-11.) Additionally, he argues that Hostage Tape would suffer minimal damage and there is a significant public interest in reducing consumer confusion. (*Id.* at 11.) Defendants counter that Hormozi cannot show a likelihood of success, there is no irreparable harm, and their business would be significantly harmed by a preliminary injunction. (Doc. No. 28 at 8, 30, 32-33.) In support of their likelihood of success argument, Defendants argue that Catlin's survey is inadequate to measure consumer confusion. (*Id.* at 21.)

### A.    Likelihood of Success on the Merits

### 1.    False Endorsement Under the Lanham Act

The Lanham Act "prohibits 'false representations concerning the origin, association, or endorsement of goods or services through the wrongful use of another's distinctive mark, name, trade dress, or other device.'" *Dryer v. Nat'l Football League*, 814 F.3d 938, 944 (8th Cir. 2016) (quoting *Am. Ass'n of Orthodontists v. Yellow Book USA, Inc.*, 434 F.3d 1100, 1103 (8th Cir. 2006)). Distinctive mark has been interpreted to include the use of someone's likeness. *See, e.g.*, *Moreland v. Kladeck, Inc.*, No. 21-cv-1975, 2022 WL 1501122, at *2 (D. Minn. May 12, 2022). To succeed on a Lanham Act false endorsement claim, a plaintiff must show the following: (1) the defendant is in commerce; (2) the defendant made a false or misleading representation of fact; (3) the representation was made in connection with goods or services; and (4) the representation is likely to cause consumer confusion as to the origin, sponsorship, or approval of the

goods or services. *Moreland*, 2022 WL 1501122, at *2; *see also Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 760 (8th Cir. 2010).

The first and third element of false endorsement are easily met in this case because Hostage Tape is in commerce and the use of the Image is connected to the products Hostage Tape sells. The Court turns next to whether Hostage Tape's use of the Image is likely to cause consumer confusion.

The core inquiry to determine the likelihood of consumer confusion is "whether the relevant average consumers for a product or service are likely to be confused as to the source of a product or service or as to an affiliation between sources based on a defendant's use." *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 947 (8th Cir. 2023) (quoting *Select Comfort Corp. v. Baxter*, 996 F.3d 925, 933 (8th Cir. 2021)). To answer that question, a court balances the following six factors:

> (1) the strength of the owner's mark; (2) the similarity between the owner's mark and the alleged infringer's mark; (3) the degree to which the products compete with each other; (4) the alleged infringer's intent to 'pass off' its goods as those of the trademark owner; (5) incidents of actual confusion; and, (6) the type of product, its cost, and conditions of purchase.

*Sensient Techs. Corp.*, 613 F.3d at 763 (quoting *Frosty Treats Inc. v. Sony Comput. Ent. Am., Inc.*, 426 F.3d 1001, 1008 (8th Cir. 2005)). No one factor controls the analysis or is determinative. *H&R Block*, 58 F.4th at 947. Instead, the weight of each factor may vary by case. *Id.* A plaintiff "must show a probability of confusion, not merely a possibility." *Lovely Skin, Inc. v. Ishtar Skin Care Prods., LLC*, 745 F.3d 877, 887 (8th Cir. 2014).

*Strength of Mark*. This factor focuses on the plaintiff's level of recognition among consumers. *See Moreland*, 2022 WL 1501122, at *3 ("[T]he 'mark' is the plaintiff's

persona and the 'strength of the mark' refers to the level of recognition that the plaintiff

has among the consumers to whom the advertisements are directed."); *see also H&R*

*Block*, 58 F.4th at 947 ("We have noted that evidence regarding the amount of money a

company has spent on advertising 'is circumstantial evidence of commercial strength, but

says little about "minds of consumers," which is the relevant unit of analysis for

likelihood of confusion.'" (quoting *ZW USA, Inc. v. PWD Sys., LLC*, 889 F.3d 441, 446

(8th Cir. 2018))).  "The degree of the mark's public recognition may be evidenced by the

extent of advertising, sales growth, publication in newspapers and magazine articles, and

survey evidence." *Johnson v. J.P. Parking, Inc.*, 717 F. Supp. 3d 798, 819 (S.D. Iowa

2024) (citing *Lovely Skin*, 745 F.3d at 888).  Social media presence is also relevant in this

inquiry, although other courts have indicated that it is not enough on its own.  *See id.* at

819-20; *Toth v. 59 Murray Enters., Inc.*, No. 15-cv-8028, 2019 WL 95564, at *7

(S.D.N.Y. Jan. 3, 2019), *aff'd in part*, *vacated in part on other grounds sub nom.*

*Electra v. 59 Murray Enters., Inc.*, 987 F.3d 233 (2d Cir. 2021).

　　　　Defendants' conduct all but concedes that Hormozi has some celebrity status

because without such status they would not have sought him out to be Hostage Tape's

"face for distribution."  However, Hormozi's level of celebrity status, or recognition, is

debatable.  Hormozi provided detailed information about his social media following as

well as a few articles and press appearances.  This is important information, but it does

not demonstrate that he has a high level of recognition even amongst Hostage Tape's

targeted demographic, males between the ages of 25 and 35.  Further, the Catlin survey

does not address the strength of Hormozi's mark because it did not measure whether

Hormozi was recognized by the participants. A plaintiff need not be a household name to make a successful claim of false endorsement, but failing to do so makes proving such a claim more difficult and requires the plaintiff to make a greater showing under the other factors. This factor weighs against Hormozi.

*Similarity Between the Marks*. "Similarity is based on an examination of the marks as a whole, including visual impression and sound." *SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980). This comparison focuses on "the overall impression created by the marks," and should "not merely compare individual features." *Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 627 (8th Cir. 1987). Hormozi relies on *White v. Samsung Electronics America, Inc.*, to explain that celebrity likeness need not refer to an exact image. 971 F.2d 1395 (9th Cir. 1992). While the Court agrees that an exact image is not necessary to succeed on a false endorsement claim, Hormozi ignores a crucial part of the Ninth Circuit's reasoning. There, Samsung created an ad featuring a robot with a blond wig and long gown that turned block letters on a game board. *Id.* at 1396. The Ninth Circuit explained: "Vanna White dresses exactly like this at times, but so do many other women." *Id.* at 1399. Instead, it was more important to look at these features of the image along with the activity she was doing in the ad, which left "little doubt about the celebrity the ad is meant to depict." *Id.* Here, the Court acknowledges that there is some similarity between the Image and Hormozi. Both have a large beard and long hair. There is nothing distinct about the Image that helps give the overall impression that it is Hormozi's likeness. There are many men with beards and long hair. This factor does not weigh in Hormozi's favor.

*Competitive Proximity.*  This factor typically refers to whether the products or goods are in direct competition.  *See, e.g.*, *Roederer v. J. Garcia Carrion, S.A.*, 732 F. Supp. 2d 836, 868-69 (D. Minn. 2010).  The plaintiff's "goods" in a celebrity endorsement case "concern the reasons for or source of the plaintiff's fame."  *White*, 971 F.2d at 1400.  For example, in *White*, Samsung was selling VCRs, which were closely related to Vanna White's source of fame:  televised performances.  *Id.*  Here, Hormozi has gained his social media following from his business ventures, including writing books about business and starting and selling businesses.  Hormozi alleges that he is very well known in the "lifehack" space.  Hormozi is not famous because he wears nose strips. Therefore, competitive proximity weighs against him.

*Intent.*  This element weighs in favor of finding likely confusion if the plaintiff shows that the defendant intended "to pass off its goods as the product of another." *SquirtCo.*, 628 F.2d at 1091.  Intent to compete with a product cannot be interpreted as intent to pass off goods as the product of another.  *Sensient Techs. Corp.*, 613 F.3d at 766. Hormozi relies on his allegations that Defendants had previously infringed on others' intellectual property rights, Defendant's desire to collaborate with him, and their refusal to take down the Image.  None of these things demonstrate clear intent by Defendants to pass off Hostage Tape as the product of Hormozi, although there is a potential these things can show intent.  This factor is neutral.

*Incidents of Actual Confusion.*  Incidents of actual confusion "are proof of the likelihood of confusion."  *Id.* at 768.  "In analyzing this factor, weight is given to 'the number and extent of instances of actual confusion."  *Id.* (quoting *Duluth News-*

*Tribune v. Mesabi Pub'g Co.*, 84 F.3d 1093, 1098 (8th Cir. 1996)).  Consumer surveys may be used to demonstrate actual confusion.  *Roederer*, 732 F. Supp. 2d at 873.  In fact, "[surveys] should be given substantial weight unless seriously flawed."  *Id.* (alteration in original) (quoting *Mutual of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 400 (8th Cir. 1987)).  Determining the probative value of a consumer value is highly fact specific.  *Id.*

Hormozi argues that he can show actual confusion through Catlin's survey.  While the survey shows that there is a resemblance between Hormozi and the Image, the survey has significant flaws.  The placement of the Image and the photographs side-by-side creates a leading bias, and it is not similar to how consumers would experience purchasing nose strips in the actual marketplace.  Hormozi confuses similarity for actual confusion.  Using this style of survey in this kind of case does not measure whether consumers would be confused about Hormozi's endorsement of or affiliation with Hostage Tape when purchasing in the actual marketplace.  This factor does not weigh in Hormozi's favor.

*Type of Product, Cost, and Conditions of Purchase.*  These characteristics of a product help a court consider whether a consumer would exercise a level of care that would eliminate the likelihood of confusion.  For example, consumers are likely to do more research about expensive products and will exercise less care when purchasing cheaper products.  *See ZW USA, Inc. v. PWD Sys., LLC*, 889 F.3d 441, 448 (8th Cir. 2018) ("[I]t seems that an ordinary consumer exercises minimal care when purchasing a low-cost, fungible product like dog-waste disposal bags, even in bulk.").  "There is always less likelihood of confusion where goods are expensive and purchased after careful

10

consideration." *Id.* (quoting *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1055 (8th Cir. 2005)). A court must "stand in the shoes of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Sensient Techs. Corp.*, 613 F.3d at 769 (quoting *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 831 (8th Cir. 1999)). Here, nose strips are a relatively inexpensive product, so it is likely consumers exercise less care when purchasing them. This factor weighs in Hormozi's favor.

After balancing the six factors, Hormozi has not shown a likelihood of consumer confusion. Defendants also argue that there is no false or misleading representation in this case to meet the fourth element of false endorsement. Hormozi focuses on Catlin's survey to prove this element as well. Upon finding that there is no likelihood of consumer confusion, however, the Court does not further consider these arguments. The Court concludes that Hormozi is unlikely to succeed on the merits of his false endorsement claim.

### 2.    Appropriation Under Minnesota Law

Under Minnesota law, the tort of appropriation "is committed when one 'appropriates to his own use or benefit the name or likeness of another.'" *Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 233 (Minn. 1998) (quoting Restatement (Second) of Torts § 652C (Am. Law Inst. 1977)). The Minnesota Supreme Court relied on the Restatement (Second) of Torts when recognizing the tort of appropriation. The Restatement further explains that the defendant need not receive a commercial benefit but requires that "the publicity is given for the purpose of appropriating to the defendant's

benefit the commercial or other values associated with the name or the likeness."
Restatement (Second) of Torts § 652C cmt. c, d (Am. Law Inst. 1977).

While the Court agrees that Hostage is using the Image for its own commercial
benefit, it is unclear whether Hostage Tape's use of the Image is truly a use of Hormozi's
likeness. The key question of fact here is whether the Image is Hormozi's likeness. The
term likeness has not been clearly defined by Minnesota courts. Hormozi points to
*Midler v. Ford Motor Co.* where the Ninth Circuit found that an impersonation of Bette
Midler's voice met the definition of likeness under the tort of appropriation. 849 F.2d
460, 463-64 (9th Cir. 1988). That case differs because Hormozi is not a household name
like Midler. Hormozi could use the Catlin survey to support his argument, but, as
addressed above, the survey has serious shortcomings, so it is not enough to show a
likelihood of success on the merits. Without more, the Court cannot find that Hormozi is
likely to succeed on the merits of his appropriation claim.

In sum, Hormozi has not demonstrated that he is likely to succeed on the merits
for either of his claims.

### B.    Irreparable Harm

"Irreparable harm occurs when a party has no adequate remedy at law, typically
because its injuries cannot be fully compensated through an award of damages." *Gen.
Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). The harm must
be "certain and great and of such imminence that there is a clear and present need for
equitable relief." *Iowa Utils. Bd. v. Fed. Commc'ns Comm'n*, 109 F.3d 418, 425 (8th Cir.
1996). Loss of reputation and goodwill can constitute irreparable harm. *United*

*Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002). Under the Lanham Act, a plaintiff is entitled to a rebuttable presumption of irreparable harm if they can show a likelihood of success on the merits of their claim. 15 U.S.C § 1116.

Here, Hormozi has not shown a likelihood of success on the merits of his Lanham Act claim so he is not entitled to a presumption of irreparable harm. Additionally, Hormozi did not sufficiently explain how any association with Hostage Tape is causing him injury other than the failure to be compensated. He alleges that the usage of the Image causes him to lose control of his reputation and goodwill, but he provides no further information on this harm, including why it cannot be compensated through an award of damages.

In conclusion, Hormozi cannot show a likelihood of success on the merits nor irreparable harm, so the balance of equities weighs against him. Even if he had demonstrated irreparable harm, his failure to show a likelihood of success on the merits would strongly weigh against granting an injunction. Accordingly, the Court denies his motion for preliminary injunction.

## II.    Defendants' Motion to Dismiss Plaintiff's Claim for Punitive Damages

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged, *Westcott v. City of*

13

*Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). A court may consider the complaint,

matters of public record, orders, materials embraced by the complaint, and exhibits

attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6). *Porous

Media Corp.*, 186 F.3d at 1079.

To survive a motion to dismiss, a complaint must contain "enough facts to state a

claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007). Although a complaint need not contain "detailed factual allegations," it must

contain facts with enough specificity "to raise a right to relief above the speculative

level." *Id.* at 555. As the Supreme Court reiterated, "[t]hreadbare recitals of the elements

of a cause of action, supported by mere conclusory statements," will not pass muster

under *Twombly*. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at

555). In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that

discovery will reveal evidence of [the claim]." *Twombly*, 550 U.S. at 556.

Defendants move to dismiss Hormozi's claims for punitive damages under Federal

Rule of Civil Procedure ("Rule," or generally, "federal rule") 12(b)(6). They argue that

Hormozi's punitive damages claims were pleaded improperly in his complaint under

Minnesota's "Gatekeeper Statute," Minn. Stat. § 549.191. (Doc. No. 22 at 6.) Hormozi

counters that the Gatekeeper Statute conflicts with the Rules 8, 9(g), and 15, so the

federal rules must control. (Doc. No. 32 at 12.) Courts in this district are split on the

question of whether the Gatekeeper Statute conflicts with the federal rules. *See Jones v.

City of St. Paul*, 715 F. Supp. 3d 1166, 1174 (D. Minn. 2024) (finding that Rule 8(a)

applies to pleading punitive damages, not Minn. Stat. § 549.191); *Hansen v. Santander*

*Bank, N.A.*, 689 F. Supp. 3d 679, 693-94 (D. Minn. 2023) (finding that the Court should follow Rule 15 instead of Minn. Stat. § 549.191 because of the recent shift in decisions in the district); *Dolphin Kickboxing Co. v. Franchoice, Inc.*, 335 F.R.D. 393, 397-99 (analyzing *Shady Grove* in depth and finding that Rule 15 answers the same question as Minn. Stat. § 549.191); *Selective Ins. Co. of S.C. v. Sela*, 353 F. Supp. 3d 847, 855-56 (D. Minn. 2018); *Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, No. 15-cv-3183, 2018 WL 9919941, at *5 (D. Minn. Mar. 8, 2018) (finding that "Federal Rule 15 and Minnesota Statute § 549.191 do not conflict").

In particular, courts have disagreed about how the United States Supreme Court's opinion in *Shady Grove v. Orthopedic Associates, P.A. v. Allstate Insurance Co.* impacts the conflict analysis. 559 U.S. 393 (2010). Likewise, the parties in this case dispute the impact of *Shady Grove*. The undersigned has previously followed this district's pre-*Shady Grove* longstanding practice of honoring the Gatekeeper Statute. *Rassier v. Sanner*, No. 17-cv-938, 2017 WL 5956909, at *7 (D. Minn. Nov. 30, 2017) ("Courts in this district, however, have consistently applied §§ 549.191-.20 to state-law claims."). In light of the recent trend amongst judges in this district, the Court revisits the question.

*Shady Grove* addressed whether Rule 23, the federal rule governing class action procedure in the federal courts, conflicted with a New York rule that "preclude[d] a suit to recover a 'penalty' from proceeding as a class action." *Shady Grove*, 559 U.S. at 397. First, the Court explained that a federal court exercising diversity jurisdiction must apply state law unless (1) there is a federal rule that conflicts with the state law, and (2) the federal rule does not violate the Rules Enabling Act. *Id.* at 398-99; *see also Selective*,

353 F. Supp. 3d at 856.  If the federal rule meets these two criteria, a court need not conduct further *Erie* analysis.  *Shady Grove*, 559 U.S. at 398.  The remainder of the Court's opinion was fractured, but a majority of the justices agreed on how to conduct the conflict analysis.  *Shady Grove*, 559 U.S. at 395-96.  The Court explained that a state law conflicts with a federal rule when the state law "answer[s] the same question" differently than the federal rule.  *Id.* at 399, 405.  Thus, an important part of the analysis is first figuring out what question is in dispute and whether the federal rule at issue answers that question.  *See id.* at 398-99.

In *Shady Grove*, a majority of the Court defined the question as "whether Shady Grove's suit may proceed as a class action."  *Id.* at 398.  While the lower court distinguished between the two finding that Rule 23 concerned certification and the New York rule concerned eligible claims, the Court found this distinction was artificial.  *Id.* at 398-99.  Upon examining the language of Rule 23, the Court found that it created "a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action," even though the federal rule itself uses the language "may be maintained."  *Id.* ("The Federal Rules regularly use 'may' to confer categorical permission . . . .")  Accordingly, the New York rule conflicted with Rule 23 because it answered the question of whether Shady Grove could maintain a class action differently.  A plurality of the Court then went on to find that Rule 23 does not violate the Rules Enabling Act.  *Id.* at 408.

Here, the question is whether Hormozi may plead punitive damages at this time.  Minnesota's Gatekeeper Statute prohibits complainants from seeking punitive damages in

16

their original complaint.  Minn. Stat. § 549.191.  Instead, complainants may move later to amend their pleadings to claim punitive damages.  *Id.*  In that motion, the complainant "must allege the applicable legal basis under section 549.20 or other law for awarding punitive damages in the action and must be accompanied by one or more affidavits showing the factual basis for the claim."  *Id.*

Rule 8 covers the general rules of pleading, including that a pleading making a claim for relief must contain both "a short and plain statement of the claim showing that the pleader is entitled to relief" and "a demand for the relief sought, which may include relief in the alternative or different types of relief."  Fed. R. Civ. P. 8(a).  Rule 9 covers special pleadings matters.  Subsection (g) states that "[i]f an item of special damage is claimed, it must be specifically stated."  Fed. R. Civ. P. 9(g).  However, punitive damages are not typically considered special damages.  *See Jones*, 715 F. Supp. 3d at 1174 (finding that Rule 8(a) applies to pleading punitive damages); 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1310, Westlaw (database updated June 2024); *Bowles v. Osmose Utils. Servs., Inc.*, 443 F.3d 671, 675 (8th Cir. 2006) ("But even if punitive damages are 'special' within the meaning of this rule, the object of the rule is to guard against unfair surprise, and, for the reasons that we have already indicated, that object is fully satisfied here.").  Rule 15 covers amended and supplemental pleadings.  It sets the rules for timing of amended pleadings before, during, and after trial. It also sets rules for when a party is required to have consent of the opposing party or leave of court to amend and when amendment is allowed as a matter of course.

The Court agrees with the recent trend in this district. Under the federal rules, a plaintiff may plead punitive damages claims like this in their original complaint and they need only make a "short and plain statement." Fed. R. Civ. P. 8(a). Under the Gatekeeper Statute, a plaintiff may not plead punitive damages in their original complaint and instead must later meet a much more rigorous standard before such amendment will be granted. Thus, under the federal rules, Hormozi would be allowed to plead punitive damages in his original complaint, while he would not be allowed to plead punitive damages in his original complaint under the Gatekeeper Statute. The state law and the federal rule answer the same question differently, therefore there is a conflict.

Next, the Court must determine whether the federal rules are valid under the Rules Enabling Act. The Supreme Court did not reach a majority on the validity analysis in *Shady Grove*, so courts in this district have turned to the Supreme Court's analysis in previous cases while also conducting the analysis under Justice Stevens's and Justice Scalia's separate approaches in *Shady Grove*. *See Dolphin Kickboxing Co.*, 335 F.R.D. at 399-400 (citing *Sibbach v. Wilson & Co.*, 312 U.S. 1 (1941)); *Selective*, 353 F. Supp. 3d at 860-63. Consistently, courts in this district have found that Rules 8, 9, and 15 are valid under the Rules Enabling Act, regardless of the approach used. *See Dolphin Kickboxing Co.*, 335 F.R.D. at 399-400; *Rogers v. Mentor Corp.*, No. 12-cv-2602, 2018 WL 2215519, at *8 (D. Minn. May 15, 2018); *Selective*, 353 F. Supp. 3d at 860-63. The Court finds these in-depth analyses convincing and so too finds that Rules 8, 9, and 15 are valid under the Rules Enabling Act. Accordingly, the Court must follow the federal rules instead of the Gatekeeper Statute in this case. So, Hormozi was allowed to plead punitive

damages in his original complaint and those claims will not be dismissed under the Gatekeeper Statute.

Defendants argue alternatively that Hormozi did not meet Minnesota's heightened pleading standard for punitive damages. In line with finding that Rule 8(a) and Rule 15 apply in this case, not the Gatekeeper Statute, the Court also applies the pleading standard found in Rule 8(a). *See Jones*, 715 F. Supp. 3d at 1174. That rule only requires "a short and plain statement of the claim showing that the pleader is entitled to relief" and "a demand for the relief sought." Fed. R. Civ. P. 8(a). The Court finds that Hormozi has met this standard.

### III.    Defendants' Motion to Strike

Defendants move to strike paragraphs 63, 64, and 92 from Hormozi's complaint as well as exhibit P19. Rule 12(f) provides that the Court may, on its own or on a party's motion, "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." A district court enjoys "liberal discretion" under this rule. *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007). "Striking a party's pleading, however, is an extreme and disfavored measure." *Id.*

Defendants argue that the allegations contained in these paragraphs and exhibit, pertaining to infringement of others' intellectual property rights, are immaterial, impertinent, and scandalous. They also argue that this kind of evidence will not be admissible at trial under Federal Rule of Evidence 404. Further, they argue that failing to strike these allegations now would lead to heavier discovery obligations. Hormozi argues

that these allegations are relevant to proving intent, his claim for attorneys' fees, and his claim for punitive damages.

The Court finds Defendants' motion to strike is premature. Many of the cases Defendants cite focus on narrowing issues for trial and rely on the Federal Rules of Evidence. Trial is a long way off in this case and Defendants will have other opportunities to make these arguments before such time. At present, Hormozi has made sufficient arguments to show that his allegations could relate to proving intent, his claim for attorneys' fees, and his claim for punitive damages. Moreover, the Court is not convinced that a failure to strike these allegations today will have a substantial impact on discovery. Even so, this ruling does not impact Defendants' ability to object to certain discovery requests if they are unduly burdensome or Hormozi otherwise abuses the tools of discovery. Therefore, the Court denies Defendants' motion to strike.

## ORDER

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Plaintiff Alex Hormozi's motion for preliminary injunction (Doc. No. [12]) is **DENIED**.

2.    Defendants Neist Media LLC, Alex Neist, and Benjamin Read's motion to dismiss and motion to strike (Doc. No. [20]) is **DENIED**.

Dated:  November 13, 2024           s/Donovan W. Frank
                                                    DONOVAN W. FRANK
                                                    United States District Judge